## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

_____

| | |
|---|---|
| BCI Acrylic, Inc. | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § CIVIL ACTION NO.: 2:23-cv-00908-JPS |
| Milestone Bath Products Inc. | § |
| (d/b/a Bellastone Bath Systems) and | § |
| TightSeal Exteriors And Bath | § |
| | § |
| Defendants. | § |
| | § |

_____

## BCI ACRYLIC, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

I.      BACKGROUND ...................................................................................................2

II.     LEGAL STANDARD........................................................................................4

III.    ARGUMENT .....................................................................................................5

        A.      Inventorship Should Not Be Resolved On a Pre-Answer Motion to
                Dismiss..................................................................................................5

        B.      Defendants Have Not Proved By Clear and Convincing Evidence
                That Mr. Whitley Should be A Named Inventor .................................7

                1.      The Documents Do Not Corroborate Mr. Whitley's
                        Invention Story.........................................................................7

                2.      The Deposition Testimony Confirms That Mr. Domanico Is
                        The Sole Inventor of Claims 5 and 7 .......................................10

                3.      At Most, There Are Issues Of Fact That Cannot Be
                        Resolved Through a Motion to Dismiss ...................................16

                4.      Even if Mr. Whitley Is A Named Inventor, Plaintiffs Have
                        not Established Ownership .......................................................17

IV.     CONCLUSION.................................................................................................17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acromed Corp. v. Sofamor Danek Grp., Inc.*,
   253 F.3d 1371 (Fed. Cir. 2001)..........................................................................4

*Allergan, Inc. v. Teva Pharms USA, Inc.*,
   No. 2:15-CV-1455-WCB, 2017 WL 11572810 (E.D. Tex. Aug. 3, 2017)...............4, 5, 16, 17

*Blue Gentian v. Tristar Products, Inc*,
   632 F. Supp. 3d 627 (D.N.J. 2021) ......................................................................7

*Blue Gentian v. Tristar Products, Inc.*,
   70 F.4th 1351 (Fed. Cir. 2023) ........................................................................7, 14

*Board of Trustees of University of Illinois v. Micron Tech, Inc.*,
   245 F. Supp. 3d 1036 (C.D. Ill. 2017) ................................................................6, 7

*Drone Tech's, Inc. v. Parrot SA*,
   838 F. 3d 1283 (Fed. Cir. 2016)......................................................................5, 6, 7

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
   383 F.3d 1352 (Fed. Cir. 2004)...........................................................................5

*HIP, Inc. v. Hormel Foods Corp.*,
   66 F.4th 1346 (Fed. Cir.), cert. denied, 144 S. Ct. 377 (2023) .......................5, 14, 15

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*,
   68 F.Supp.2d 494 (D.N.J. 1999) .........................................................................17

*National Diamond Syndicate, Inc. v. Flanders Diamond USA, Inc.*,
   264 F.Supp 2d 631 (N.D. Ill. 2003) .....................................................................17

*Shum v. Intel Corp.*,
   499 F.3d 1272 (Fed. Cir. 2007)............................................................................5

**Statutes**

35 U.S.C. § 256(b) ...............................................................................................5

Case 2:23-cv-00908-JPS    Filed 12/22/23    Page 3 of 21    Document 32

Defendants' motion to dismiss should be denied because Defendants do not dispute that Mark Domanico is a properly named inventor of the '243 patent and that he assigned all of his rights in the '243 patent to BCI. Federal Circuit precedent holds that these facts are dispositive of Defendants' standing challenge and that the Court should not reach the merits of Defendants' inventorship defense at this time because Defendants have not taken any steps to correct the inventorship of the '243 patent.

Even if the Court reaches Defendants' inventorship defense, Defendants' motion still fails because Defendants have not proved by clear and convincing evidence that Mr. Whitley should be a named inventor. Mr. Whitley contends that he contributed to two claims (claims 5 and 7), but the documents and deposition testimony show that Mr. Domanico conceived the method in those claims before he ever heard from Mr. Whitley. Moreover, the limitations in claims 5 ("the grout lines are defined by rounded edges") and 7 (grout lines are "substantially 0.005 inches") are simply characteristics of real grout lines. Mr. Whitley should not get credit for suggesting rounded, shallow grout lines to Mr. Domanico, but even if he did, Defendants have not shown that Mr. Whitley did more than identify well-known facts or the state of the art.

At the very least, there are unresolved issues of fact regarding whether Mr. Whitley contributed to the conception of claims 5 and 7. Mr. Whitley alleges that he contributed to those claims, but Mr. Domanico vehemently disagrees. ECF No. 27-3 at 150:7-8 ("Hell no. Hell no.")). This factual dispute cannot be resolved on the papers because it turns on the credibility of witnesses in light of the few corroborating documents. This can only be done at trial or through a full evidentiary hearing and cannot serve as a basis for prematurely terminating this action at the pleading stage. Defendants' motion to dismiss should be denied.

1

## I.    BACKGROUND[1]

Mark Domanico is a self-proclaimed tinkerer who owned and ran a bath renovation business, Luxury Bath Liners, Inc.  ECF No. 27-3, 22:7-23:4; 44:2-24.  For some bathroom projects, companies use acrylic sheets that simulate the appearance of real tile in order to reduce the time and expense of the project.  ECF No. 27-1, 1:19-44.  One of the challenges with making simulated tile acrylic sheets is making the simulated grout lines look realistic.  ECF No. 27-3, 52:19-53:9.  Prior to Mr. Domanico's invention, the simulated grout lines were formed using a thermoforming process.  *Id.*; Ex. 1, Deposition of Jeffrey Whitley, 21:7-22:1.  The acrylic sheets were attached to a mold, heated, and then sucked down into the mold where the mold formed the simulated grout lines in the acrylic sheets.  ECF No. 27-3, 52:19-54:6; Ex. 1 at 21:7-22:1.  This process was time consuming and expensive because of the time to heat the sheet, mold it, and then let it cool.  ECF No. 27-3, 52:19-54:6.  Also, a different mold was need for every tile pattern.  *Id*.

Inspired by a nameplate on a desk, Mr. Domanico came up with the idea of making simulated tile panels in which simulated grout lines were cut into acrylic sheets using a router and a CNC machine.[2]  ECF No. 27-3 at 60:7-61:8.  Mr. Domanico created prototype samples using a CNC machine and a router bit that he had on hand.  The particular router bit he had on

---

[1] BCI is aware of the Court's instruction that parties should omit a fact section from briefing on a motion to dismiss because the Court will "only consider the facts as they appear in the complaint or other pleadings" and requiring a set of itemized disputed facts (ECF No. 7 at 4). For the unique motion filed by Defendants, however, the Court is allowed to go outside the pleadings, which Defendants have already done. Likewise, while Defendants submitted a set of narrative facts (ECF No. 27-9), they are not itemized per the Court's instruction.  BCI requests that the Court consider this brief background in response to Defendants' narrative facts.

[2] A computer numerical control ("CNC") machine is a motorized maneuverable tool that is controlled by a computer.

hand was a straight bit (instead of rounded bit) because he used the straight bit to cut the thermoformed acrylic sheets to size. *Id*. The problem with the straight bit was that the "grout lines" it made were so sharp that they could cut someone's hand. *Id*. at 61:15-23; 103:12-21. Moreover, real grout lines are not sharp – they are round – so sharp grout lines did not look real. *Id*. at 145:16-146:10. Mr. Domanico was well-aware of this problem and had ordered a rounded bit to use in the future. *Id*. at 103:12-21; 140:19-142:14. He was very excited about his new idea and did not want to delay getting it in the hands of prospective customers. *Id*. at 61:21-62:10.

Mr. Domanico sent some of these prototype sheets to Jeff Whitley. *Id*. Mr. Whitley owned and ran Milestone Bath Products, which was a Canadian customer and distributor of products made by Luxury Bath Liners. Ex. 1 at 16:3-11; 29:4-15. Upon receipt of the samples, Mr. Whitley sent an email to Mr. Domanico, stating that the samples "look really nice" and that "we really love the concept." ECF No. 27-2 at 11. Mr. Whitley suggested using a rounded bit to create a "smoother cut" with "[l]ess of an impression," but Mr. Domanico was already aware of the issues with sharp grout lines and the solution of using a rounded router bit, which he explained in his responsive email the next day:

From: Mark Domanico <md@luxbathinc.com>
Date: November 5, 2014 at 5:44:13 PM EST
To: Jeff Whitley <jeff.whitley@milestonebath.com>, Mary Riordan <MaryR@luxbathinc.com>
Cc: Tiffany Koll <tiffany.koll@milestonebath.com>, Laura Dolamore <laura.dolamore@milestonebath.com>
Subject: RE: new tile walls


Jeff,
We have already ordered a rounded bit for our CNC Router.
Mary wanted you to have the samples ASAP.
No one else has samples yet.

Mark Domanico

From: Jeff Whitley [mailto:jeff.whitley@milestonebath.com]
Sent: Tuesday, November 4, 2014 10:44 AM
To: Mary Riordan; Mark Domanico
Cc: Tiffany Koll; Laura Dolamore
Subject: new tile walls

Hi Mary and Mark,

I received the new wall samples and they look really nice.

I wanted to share a concern that several people here voiced on this product, perhaps you have even heard this before.  Although we really love the concept, everybody here was concerned with the sharp edges at the grout lines.  We think this will prevent some people from purchasing the walls, and in an extreme case could be possible to actually cut someone.

As a suggestion, the exact same process but using a different shaped bit may create a smoother cut that solves the above issues.  Less of an impression would also make it more realistic.

*Id.*; ECF 27-3 at 140:19-142:14.

Mr. Domanico continued to receive positive feedback on his new invention and filed a provisional patent application on February 18, 2015 and a non-provisional application on February 18, 2016.  ECF 27-1.  That application resulted in the '243 patent-in-suit, which issued on December 4, 2018.  *Id.*

## II. LEGAL STANDARD

While the burden is typically on a plaintiff to establish standing, in cases such as this where the standing challenge is based inventorship, the burden is on defendants to prove incorrect inventorship by clear and convincing evidence.  *Allergan, Inc. v. Teva Pharms USA, Inc.*, No. 2:15-CV-1455-WCB, 2017 WL 11572810 at *2, *7 (E.D. Tex. Aug. 3, 2017) (citing *Drone Tech's, Inc. v. Parrot SA***,** 838 F. 3d 1283, 1294 (Fed. Cir. 2016)).  Moreover, there is a "presumption that [a patent's] named inventors are the true and only inventors." *Acromed Corp. v. Sofamor Danek Grp., Inc.,* 253 F.3d 1371, 1379 (Fed. Cir. 2001).  Thus, "in order to obtain dismissal of the suit for lack of standing, defendant[s] therefore must overcome that

presumption and meet the accompanying burden of proof by showing incorrect inventorship by clear and convincing evidence." *Allergan* 2017 WL 11572810, at *7.

In order to be a joint inventor, a person must "(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art**.**" *HIP, Inc. v. Hormel Foods Corp.*, 66 F.4th 1346, 1350 (Fed. Cir.), cert. denied, 144 S. Ct. 377 (2023). Defendants must prove Mr. Whitley's "contribution to the conception of the invention with more than [his] own testimony concerning the relevant facts." *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1382 (Fed. Cir. 2004). Whether Mr. Whitley's "testimony has been sufficiently corroborated is evaluated under a 'rule of reason analysis,' which requires that an 'evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.* (emphasis omitted). Upon the filing of a proper counterclaim and motion, a patent can be corrected to reflect co-inventorship. 35 U.S.C. § 256(b).[3]

## III.    ARGUMENT

### A.    Inventorship Should Not Be Resolved On a Pre-Answer Motion to Dismiss

"There is a 'presumption that [a patent's] named inventors are the true and only inventors.'" *Drone,* 838 F. 3d at 1292. Here, no standing issue exists on the face of the

---

[3] While there is generally no right to a jury trial on inventorship, a right to a jury trial may arise where there are common factual issues between an inventorship claim and other claims in the case. *Shum v. Intel Corp.*, 499 F.3d 1272, 1279 (Fed. Cir. 2007). Defendants have not answered the Complaint, so it is premature to determine it there will be a right to a jury trial in this case.

5

complaint because BCI is the assigned owner of the '243 patent and the named plaintiff. *Id.*; *Board of Trustees of University of Illinois v. Micron Tech, Inc.*, 245 F. Supp. 3d 1036, 1042 (C.D. Ill. 2017) (denying motion to dismiss for lack of standing); '243 patent.

Defendants have not filed a counterclaim or motion under § 256, so there is no need to address Defendants' inventorship challenge. *Drone*, 838 F.3d at 1294. In *Drone Tech's*, the defendant moved to dismiss the complaint for lack of subject matter jurisdiction because the named inventor who assigned the patents to the plaintiff was not the true inventor and the assignee did not have standing to sue for infringement. *Id.* at 1288. The Federal Circuit held that the district court was not obligated to consider inventorship when it assessed whether the plaintiff had standing to sue because the "district court never granted (or even considered) a § 256 motion, so the court was not presented with a newly established inventorship when [the infringing party] moved to dismiss based on [the assignee's] alleged lack of standing." *Id.* at 1294. The court held that without a § 256 correction, the infringing party had not provided a persuasive reason for rejecting the "presumption that [a patent's] named inventors are the true and only inventors," (*Id.* at 1292 (quotation marks omitted)), and the court was "not compel[led to] consider[ ] inventorship in determining standing." *Id.* at 1294. Like the defendant in *Drone Tech's*, Defendants "do[] not cite any controlling authority suggesting that [the Court] must undertake the review it seeks; namely, a substantive examination of *inventorship* in order to resolve an issue of *standing* in an infringement action where the plaintiff's claim to title is not otherwise in dispute." *Id.* at 1293 (emphasis in original).

Likewise, the court in *University of Illinois* evaluated "the patents in the state they existed at the beginning of this lawsuit" because no motion under § 256 had been filed. 245 F. Supp. 3d at 1042. The court denied the defendant's motion to dismiss for lack of standing

because the defendant did not argue that the plaintiff's patent assignment was lacking in any way. *Id.* The same result should occur here. Defendants do not dispute that BCI owns the '243 patent and they have not filed and won a § 256 motion. Therefore, their motion to dismiss should be denied.

The case cited by Plaintiffs, *Blue Gentian v. Tristar Products, Inc*., 70 F.4th 1351 (Fed. Cir. 2023), proves BCI's point. The defendants in *Blue Gentian*, unlike the defendants in this case, followed the proper course to resolve an inventorship dispute. They answered the complaint, filed a counterclaim to correct inventorship, and engaged in discovery of all issues, including invalidity. *Id.* at 1357. The court then held a multi-day hearing that included pre-and post-hearing briefing. *Blue Gentian v. Tristar Products, Inc,* 632 F. Supp. 3d 627, 631 (D.N.J. 2021). Only then did the court rule on the inventorship issue. *Id*. Through their motion to dismiss, Defendants seek to circumvent these procedural safeguards and prematurely terminate this case at the pleading stage. This is wholly improper. If Defendants wish to correct the inventorship of the '243 patent, they need to answer the Complaint and then plead and litigate a proper claim under § 256. *Drone*, 838 F.3d at 1294. Until that happens, Defendants' motion to dismiss is premature and should be rejected. *Id.*; *University of Illinois*, 245 F. Supp. 3d at 1042.

**B. Defendants Have Not Proved By Clear and Convincing Evidence That Mr. Whitley Should be A Named Inventor**

**1. The Documents Do Not Corroborate Mr. Whitley's Invention Story**

Defendants rely on just one document to corroborate Mr. Whitley's inventorship claim, an email from Mr. Whitley to Mr. Domanico. ECF No. 27-2 at 11. But that email thread confirms that Mr. Domanico conceived the subject matter of claims 5 and 7 before Mr. Whitley ever sent his email. *Id.* While Mr. Whitley suggested using a different shaped bit to make the grout lines, Mr. Domanico responded the very next day that "[w]e have already ordered a

rounded bit for our CNC Router" and that Luxury Bath's CEO, Mary Riordan, wanted Whitley "to have the samples ASAP." *Id.* The Nov. 4 email also fails to corroborate the specific depth (0.0005 inches) recited in claim 7.

In his deposition, Mr. Domanico confirmed that he was well-aware of the problem with sharp edges on the "grout lines" because he had cut himself and ordered a rounded bit before he heard from Mr. Whitley. ECF No. 27-3 at 61:19-23, 140:19-142:14. Mr. Domanico had sent the samples to Mr. Whitley, knowing that they had undesirable sharp edges, in order to drum up interest in his new product, all the while knowing that the finished product would have shallow, rounded simulated grout lines – just like real grout lines. *Id.* at 140:19-144:11; 145:16-146:10; 148:12-25. Thus, the November 4-5, 2014 email thread between Mr. Whitley and Mr. Domanico does not prove by clear and convincing evidence that Mr. Whitley conceived of rounded, shallow simulated grout lines prior to Mr. Domanico. To the contrary, that email thread proves that Mr. Domanico was already aware of the problem and the solution to that problem. Mr. Whitley did not contribute to the conception of the method described in claims 5 and 7 because he did not tell Mr. Domanico anything he did not already know.

Mr. Whitley claims that he told Mr. Domanico to use shallow, rounded grout lines at a meeting prior to the Nov. 4, 2014 email (ECF No. 27-2, ¶ 7); however, there are no documents that corroborate this alleged discussion, not even an email to schedule the meeting. Ex. 1 at 84:18-21; 110:5-9. Had there been such a meeting, and had Mr. Whitley recommended shallow, rounded grout lines previously, one would expect him to have mentioned that in his Nov. 4, 2014 email, e.g. "As I mentioned previously" or "As we discussed at our previous meeting." But the Nov. 4 email says nothing about a prior discussion. ECF No. 27-2 at 11. Instead, the tone and context of the Nov. 4 email strongly suggests that was the first time Mr.

Domanico had made this suggestion to Mr. Domanico. Defendants try to spin this as Mr. Whitely remembering a previous discussion and Mr. Domanico does not, but the more likely explanation is that there was no such discussion before Nov. 4. Even the declaration that Mr. Whitley wrote for Mr. Domanico says nothing about Mr. Whitley proposing rounded, shallow grout lines before the Nov. 4 email. [4]

Defendants' argument that the provisional patent application is evidence of Mr. Whitley's contribution is premised on the wrong dates. ECF No. 27 at 9. Defendants argue that the provisional application was filed in 2014 and suggest that subsequent changes to the non-provisional application in 2016 reflect Mr. Whitley's contribution. *Id.* However, the provisional application was filed on February 18, 2015 – several months after the Nov. 4, 2014 email from Mr. Whitley. ECF No. 27-1, '243 patent. Thus, any differences between the provisional and non-provisional applications are not attributable to the Whitley email because that email existed before *either* application was filed.

Finally, Defendants erroneously argue that Ms. Riordan's comments in response to the Nov. 4 email suggest that she wanted feedback regarding the "new wall tiles" and that she considered Mr. Whitley a "valuable contributor to the new tile walls." ECF No. 27 at 5. Ms. Riordan said no such thing. She said that she had a few concepts to run by Mr. Whitley and wanted his feedback (ECF 27-6), however, Mr. Whitley confirmed that those concepts were business concepts, not CNC grooving or technical concepts. Ex. 1 at 95:1-96:8.

---

[4] Defendants characterize Mr. Whitley's testimony regarding "the pre-email communication" as unrebutted by Mr. Domanico. ECF No. 27 at 8. However, Defendants did not disclose Mr. Whitley's story about an alleged "pre-email communication" until *after* Mr. Domanico's deposition. Thus, Mr. Domanico (and BCI) did not have an opportunity to rebut Mr. Whitley's uncorroborated allegations about a pre-email communication.

9

### 2. The Deposition Testimony Confirms That Mr. Domanico Is The Sole Inventor of Claims 5 and 7

#### a. Mr. Domanico Provided Unbiased Testimony That He Alone Conceived of Claims 5 and 7

Mr. Domanico testified in no uncertain terms that he alone conceived of the claimed invention of the '243 patent, without any help from Mr. Whitley:

- "we never did it together. The only thing I ever got from [Mr. Whitley] was this [email], and it was after the fact that I already had that already incorporated and ordered." ECF No. 27-3, 151:12-15.

- "This is a hope and prayer. It's not what happened. It's not. I invented it. I never even thought of Mr. Whitley or anybody else I talked to. I'm the one who put in the hours, I'm the one that did all the prototypes, I'm the one that invented it." *Id*. at 170:3-8.[5]

Mr. Domanico is also highly credible. He does not work for any of the parties and he has nothing to gain or lose from the outcome of this case. *Id*. at 37:22-38:4. Mr. Domanico has gone out of his way to remain neutral and declined offers by both sides to represent him. *Id*. at 125:9-17. Mr. Domanico is friends with Mr. Whitley, but did not allow that to sway his testimony. *Id*. at 164:21-165:6) ("I'm calling Jeff a liar here, and I don't want to do that. He's always been my friend, we have gone fishing together, but, dammit, I'm going to tell you the truth."). Mr. Domanico even withstood pressure from Mr. Whitley to sign a declaration that Mr. Whitley and Defendants' counsel wrote for him. Ex. 2, Unsigned Declaration of Mark Domanico; Ex. 3, Domanico Email of October 31, 2023; Ex. 1 at 43:15-19, see also *id*. at 36:18-

---

[5] Defendants comment on Mr. Domanico's understanding of the legal test for inventorship (ECF No. 27 at 8-9), but the parties are relying on Mr. Domanico for his factual testimony, not his legal conclusions.

20 ("Q. How many conversations have you had with Mr. Domanico about this lawsuit? A. Approximately ten."). Mr. Domanico strongly disagreed with that declaration and refused to sign it:

- "Q. Did you prepare this declaration? A. Hell no." (ECF No. 27-3, 150:7-8

- "I thought [the declaration] was way off base, and I wanted to insert my story, because of -- it's wrong." *Id*. at 151:7-9.

- "'(reading) Mr. Whitley and I together developed the grout line cut-out.' Hell no. Hell no. I worked on that all night sometimes by myself." *Id*. at 163:4-7.

- "What he's trying to say in 7 is that we developed it together. That's what the last paragraph says. I don't remember that in any way, shape, or form." *Id*. at 164:4-8.

- "I was alone in that room working on stuff and making drawings and - - many, many other projects period." *Id*. at 165:4-6.

Milestone mischaracterizes Mr. Domanico's recollection of key events as "fuzzy" and suggests that his "recollection is not as clear as his insistence would suggest." ECF No. 27 at 1, 7. But Mr. Domanico's memory regarding the key facts was firm, specific, and unwavering. ECF No. 27-3 at 52:2-56:2, 151:2-15, 162:3-165:10, 170:3-8. Mr. Domanico was equally clear and certain regarding the lack of involvement by Mr. Whitley. *Id*. The fact that Mr. Domanico did not recall every last detail of events taking place up to 10 years ago is neither surprising nor relevant. *Id*., at 38:10-19, 39:23-40:7. Indeed, Mr. Whitley did not recall numerous details either and, to use Defendants words, "it is undeniable that [Mr. Whitley's] recollection is not as clear as his insistence would suggest." Ex. 1 at 63:4-11 ("Q. Do you recall when you next heard from Mark regarding this project after the November 2015 meeting? A. I don't recall. Q.

Regardless of timing, do you recall what the next step was in the project? A. I don't recall specifically."); *see also id.* at 24:7 ("I don't know the exact month"); 25:4 ("I don't recall that"); 30:9 ("I don't recall the exact time"); 47:12 ("I don't recall that"); 62:23-24 ("I don't recall the next sort of communication I had with Mark on that"); 67:18 ("I don't know if that's correct"); 69:16-18 ("I don't recall if it was Mark's samples or my samples that were first deemed acceptable. I don't recall that."); 82:9 ("I don't know if I offered to sell it to them"); 99:24 ("I don't know offhand the details"); 109:18-21 ("Q. Do you recall ever having further discussions about the CNC process to make a simulated tile sheet after this email? A. I don't recall."). Thus, Defendants' suggestion that Mr. Whitley's recollection is better than Mr. Domanico's is not accurate.

### b.     Mr. Whitley Is Not Credible

In stark contrast to Mr. Domanico, Mr. Whitley is highly biased. Mr. Whitley is the former CEO and current President of Milestone. Ex. 1 at 16:3-17. Mr. Whitley, through his wife, is also the former owner of Milestone. *Id.* The Whitley family sold Milestone in 2022 and in the purchase agreement for that sale Mr. Whitley made a representation and warranty regarding the '243 patent. *Id.* at 17:1-4, 110:24-111:20.[6] Thus, Mr. Whitley has a lot at stake in this dispute.

Mr. Whitley's silence in the face of the '243 patent is also telling. Mr. Domanico told Mr. Whitley about the application for the '243 patent in 2014 (ECF No. 27-3 at 136:21-25, 144:15-21) and the '243 patent issued in December 2018. ECF No. 27-1. Mr. Whitley never took any action to correct the inventorship of the '243 patent – and still hasn't to this day. If

---

[6] Milestone refused to produce the purchase agreement, even on an attorney's-eyes-only basis, until the parties agreed on a protective order. The parties are currently negotiating that protective order.

Mr. Whitley truly believed he should be a named inventor of the '243 patent, one would have expected him to take action to correct that inventorship.

Mr. Whitley also struggles with the truth. During his deposition, Mr. Whitley was asked if he had any substantive communications with Mr. Domanico about this lawsuit other than just setting up meetings, and his response was an unequivocal "No." Ex. 1 at 38:16-19. Mr. Whitley did not disclose that he had sent Mr. Domanico the draft declaration that he pressured Mr. Domanico to sign. *Id*. at 38:16-39:14. When confronted with that declaration, Mr. Whitley testified that he did not know if he had seen the declaration before and he did not know where it had come from, even though he is the one who sent it to Mr. Domanico. *Id.* at 40:16-43:19; Ex. 3). Mr. Whitley was then asked if he created the document, and he again gave an unequivocal "No." Ex. 1 at 41:22-23. However, metadata from that document shows that Mr. Whitley both authored the declaration and was the last person to modify it. Ex. 4, Metadata of Ex. 2. Mr. Whitley eventually, but begrudgingly, admitted that he wrote the text of the declaration. Ex. 1 at 42:5-43:6. However, Mr. Whitley would have been content to lie about his communications with Mr. Domanico had BCI not separately obtained a copy of that declaration from Mr. Domanico and confronted Mr. Whitley with it.

Mr. Whitley's declaration is suspect because it is wholly at odds with the testimony of Mr. Domanico, who has no motivation to lie. Aside from the differences in the invention story, the Whitley declaration includes misleading statements and inaccuracies. For example, in his declaration Mr. Whitley misleadingly suggests that he developed the claimed invention in collaboration with a company named Optima before his discussions with Mark Domanico. ECF No. 27-2, ¶ 4). However, Mr. Whitley admitted during his deposition that the Optima process

was simply the process that Mr. Domanico developed and disclosed to Mr. Whitley. Ex. 1 at 25:18-23, 26:21-23; 74:1-16. This is yet another example of Mr. Whitley shading the truth.

Mr. Whitley also states in his declaration that Luxury Bath Liners was located in Libertyville, IL (ECF No. 27-2, ¶ 6), but Luxury Bath Liners was actually located in Glendale Heights, IL. Ex. 5, Domanico Email of May 13, 2015. While this detail has no bearing on inventorship, it was easily verifiable by the documents Defendants produced in this case. *Id*. It shows that (a) Mr. Whitley's recollection of events from 2014 is not nearly as accurate as he represents and (b) he put little effort into verifying the accuracy of the statements in his declaration.

### c.   Mr. Whitley's Alleged Contribution Was Not Significant

In order to be a joint inventor, a person must "(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art**.**" *HIP*, 66 F.4th at 1350. Defendants do not even attempt to show that Mr. Whitley's contribution satisfies this three-pronged test, nor could they.

First, Mr. Whitley did not make a significant contribution to the conception or reduction to practice of claims 5 and 7. As discussed above, unlike the inventors in *Blue Gentian,* Mr. Domanico conceived the claimed invention before he ever heard from Mr. Whitley. [7]

---

[7] Defendants attempt to paint the picture that Messrs. Whitley and Domanico were regular collaborators. This is not accurate. The relationship between Domanico/Luxury Bath and Whitley/Milestone was simply that of manufacturer and customer. Ex. 1 at 29:4-15.

Second, Mr. Whitley's alleged contribution is insignificant when measured against the dimension of the full invention. Claims 5 and 7 depend, ultimately, from claim 1. Claim 1 recites nine steps for manufacturing a simulated tile sheet, including determining tile pattern characteristics, entering the tile pattern characteristics into a computer, selecting a sheet of acrylic material, placing the acrylic material below a computer controlled material removal tool, retrieving the tile pattern characteristics from the computer, and forming the grout lines by removing a predetermined amount of material from the top surface of the acrylic sheet. Mr. Whitley does not allege that he contributed to any of those steps. Instead, his only alleged contribution was that the simulated grout lines should be round (claim 5) and about 0.0005 inches (claim 7). Compared to the dimension of the full invention, this alleged contribution is insignificant. *HIP*, 66 F.4th at 1352-53 (rejecting inventorship claim because "the specification, claims, and figures all illustrate that Howard's alleged contribution of preheating the bacon or meat pieces with an infrared oven is 'insignificant in quality' when 'measured against the dimension of the full invention,' *Pannu*, 155 F.3d at 1351, which squarely focuses on a preheating step using a microwave oven.").

Third, at most, Mr. Whitley merely explained to Mr. Domanico well-known concepts and/or the current state of the art. *Id.* The entire purpose of the claimed invention was to create simulated grout lines that look like real grout lines. ECF 27-1 at 1:13-15. The fact that real grout lines are generally round and shallow (i.e. about 0.005 inches), and therefore simulated grout lines should also be round and shallow, was a "well-known concept and/or the current state of the art." Ex. 1 at 60:13-61:25. Indeed, Mr. Whitley admitted that at the time of the alleged invention, he did not believe that it was inventive to simulate rounded grout lines. - Ex.

1 at 115:6-18.[8]  Mr. Whitley claims that his contribution to claims 5 and 7, was the use of a rounded bit to make those shallow, rounded grout lines.  Ex. 1 at 83:22-25.  However, Mr. Whitley acknowledges that router bits for forming rounded edges were well-known at the time of the alleged invention.  Ex. 1 at 61:22-25, 71:9-13.  Defendants point to statements made during prosecution of the '243 patent that the subject matter of claims 5 and 7 was patentable; however, those statements apply to the entirety of those claims, including the elements recited in independent claim 1.  ECF No. 27 at 9-10.  The applicants for the '243 patent never argued that rounded, shallow grout lines, *on their own*, were inventive.

### 3.    At Most, There Are Issues Of Fact That Cannot Be Resolved Through a Motion to Dismiss

The Whitley and Domanico deposition testimony cannot be reconciled.  On the key issue of who conceived the subject matter of claims 5 and 7, their recollections are directly at odds with each other and the court or a jury would need to make credibility determinations that cannot be made at this stage of the proceedings.  In *Allergan, Inc. v. Teva Pharms USA, Inc*., the court was presented with conflicting deposition testimony from the named inventors and the proposed inventors.  2017 WL 11572810, at *3-5.  In view of that conflicting testimony, the court held that the "evidence adduced by the defendants at this point is insufficient to overcome the presumption of correct inventorship . . . For that reason, the Court concludes that the defendants have not shown incorrect inventorship by clear and convincing evidence and are not

---

[8] As noted in BCI's motion to compel, Milestone seeks to have its cake and eat it too. If Milestone contends that Mr. Whitley made an inventive contribution to claims 5 and 7, it should be precluded from challenging the validity of those claims.  If Milestone contends that claims 5 and 7 are not patentable, then Mr. Whitley cannot be a named inventor because there was nothing to invent.  Mr. Whitley's testimony on this point was all over the map.  Cf. Ex. 1 at 113:14-17 ("Q. Do you believe that it was inventive to have rounded simulated grout lines? A. Yes.") with 115:14-18 ("Q. Did you ever apply for a patent on the subject matter that is described in the 243 patent? A. No. Q. Why Not? A. Did not feel it was patentable.")

entitled to a pretrial dismissal for lack of standing. The Court will ultimately resolve the defendants' § 102(f) claim at the merits stage." *Id.* at \*12. See also *National Diamond Syndicate, Inc. v. Flanders Diamond USA, Inc*., 264 F.Supp 2d 631 (N.D. Ill. 2003) ("Because there is a genuine issue of material fact concerning whether Mr. d'Haene conceived of the Flanders Brilliant Cut independently before running across Mr. Tankosic's Petar Cut design, Plaintiffs are not entitled to summary judgment under Section 102(f)"); *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,* 68 F.Supp.2d 494, 500– 01 (D.N.J. 1999) (denying summary judgment under Section 102(f) where the testimony of the inventor listed in the patent application was inconsistent on the question of inventorship). The Court should reach the same result here.

### 4. Even if Mr. Whitley Is A Named Inventor, Plaintiffs Have not Established Ownership

Even if Mr. Whitley were a proper inventor, that is not dispositive of standing because the record is devoid of any information regarding who owns Mr. Whitley's rights in the '243 patent if he is a named inventor. Defendants have not established if Mr. Whitley is obligated to assign his rights in the '243 patent to some other entity and whether that entity consents to suit.

## IV. CONCLUSION

For the foregoing reasons, BCI respectfully requests that the Court deny Defendants' motion to dismiss.


Dated: December 22, 2023

s/Aaron T. Olejniczak
Aaron T. Olejniczak (Wis. Bar No. 1034997)
aarono@andruslaw.com
Christopher R. Liro (Wis. Bar No. 1089843)
chris.liro@andruslaw.com
litigation@andruslaw.com

Andrus Intellectual Property Law, LLP
790 North Water Street, Suite 2200
Milwaukee, WI 53202
Phone: (414) 271-7590

William Frankel
Mark Remus
CROWELL & MORING LLP
455 N. Cityfront Plaza Drive, Suite 3600
Chicago, IL 60611
Tel: 312-321-4200
wfrankel@crowell.com
mremus@crowell.com

*Attorneys for Plaintiff BCI Acrylic, Inc.*