# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

_____

| | |
|---|---|
| BCI Acrylic, Inc. | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § CIVIL ACTION NO.: 2:23-cv-00908-JPS |
| Milestone Bath Products Inc. | § Judge J.P. Stadtmueller |
| (d/b/a Bellastone Bath Systems) and | § |
| TightSeal Exteriors And Bath | § |
| | § |
| Defendants. | § |

_____ §

ORAL AND VIDEOTAPED DEPOSITION OF JEFFREY WHITLEY,

pursuant to Rule 30(b)(1)taken at 9:06 a.m., Wednesday,

December 6, 2023, at the Fairfield Marriott, 407 Front

Street, Belleville, Ontario, Canada, K8P 3L8, before

Laurie Barker, Court Reporter, and Travis Jewell, Legal

Videographer.

```
 1  APPEARANCES:

 2  FOR BCI ACRYLIC, INC.:

 3      BY:  MARK REMUS, ESQUIRE

 4           CROWELL & MORING LLP

 5           455 N. CITYFRONT DRIVE, SUITE 3600

 6           CHICAGO, IL  60611

 7

 8

 9  FOR MILESTONE BATH PRODUCTS INC.

10  (D/B/A BELLASTONE BATH SYSTEMS) AND

11  TIGHTSEAL EXTERIORS AND BATH

12

13      BY:  ERIK J. HALVERSON, ESQUIRE

14           DEVON C. BEANE, ESQUIRE

15           K&L GATES LLP

16           FOUR EMBARCADERO CENTER, SUITE 1200

17           SAN FRANCISCO, CA  94111-5994

18

19

20  VIDEOGRAPHER:

21           TRAVIS JEWELL

22

23

24

25
```

1                    I N D E X

2

3

4                                          PAGE

5

6  JEFFREY WHITLEY, Affirmed

7

8  EXAMINATION BY MR. REMUS                5 to 115

9

10 RE-EXAMINATION BY MR. HALVERSON        115 to 117

11

12 CERTIFICATION                               118

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     I N D E X

2   EXHIBITS                                           PAGE

3   1    U.S. Patent 10,144,243.                        31

4   2    Declaration of Mark Domanico                   36

5   3    Declaration of Jeffrey Whitley                 67

6   4    Email thread bearing Production No. MBP-000005    82

7   5    Email thread bearing Production No. MBP-000003    85

8   6    Email from Jeff Kinkaid dated June 26, 2025

9     bearing Production Nos. MBP-000006 through 09.    87

10  7    Email thread bearing Production Nos. MBP-000026

11    through 27                                        90

12  8    Email thread bearing Production Nos. MBP-00048

13    through 53                                        92

14  9    Email from Mark Domanico to Scott Rosenbach

15    bearing Production No. MBP-000040                 95

16  10   Email from Mark to Jeff copying Scott bearing

17    Production Nos. MBP-000038 through 39             96

18  11   Email from David Glassberg to

19    jeff@bathsolutions.ca bearing Production No.

20    MBP-000060

21    98

22

23  12   Email thread bearing Production No. MBP-000057

24    100

25

1    MR. JEWELL:  We are now on the record at 14:04

2    UTC, on December 6, 20?23.  Audio and video

3    recording will continue to take place until all

4    parties agree to go off the record.  Please note

5    that microphones are sensitive and may pick up

6    whispering and private conversations.

7        This is the video-recorded deposition of Jeff

8    Whitley being taken in the matter of BCI Acrylic

9    versus Milestone Bath Products.  My name is Travis

10   Jewell, I'm a legal videographer on behalf of U.S.

11   Legal Support.  I am not related to any party in

12   this action nor am I financially interested in the

13   outcome.

14       At this time would counsel state their

15   appearances for the record after which the Court

16   Reporter will swear the witness.

17   MR. REMUS:  Mark Remus on behalf of BCI Acrylic,

18   Inc.

19   MR. HALVERSON:  Erik Halverson on behalf of

20   Milestone Bath Products Inc. and TightSeal LLC, as

21   well as the witness.  With me today in the room as

22   well is Devon Beane.  Both of us are from K&L

23   Gates LLP.

24   MADAM REPORTER:  Laurie Barker, Court Reporter.

25       Okay, could you please begin by stating your

1    name for the record?

2        THE DEPONENT:  My name is Jeffrey Whitley.

3        MADAM REPORTER:  And do you affirm that the

4        evidence you're about to give today, touching on

5        the matters in question herein, shall be the

6        truth, the whole truth and nothing but the truth?

7        THE DEPONENT:  I do.

8        MADAM REPORTER:  Thank you.

9            We're on record, Counsel.

10   BY MR. REMUS:

11       Q.   Good morning Mr. Whitley.  Could you

12   please state your residence address?

13       A.   My residence address is 1284 Old Highway 2,

14   Belleville, Ontario, K8N 4Z2.

15       Q.   Have you been deposed before?

16       A.   Yes.

17       Q.   How many times?

18       A.   Once.

19       Q.   When was that?

20       A.   Approximately four years ago.

21       Q.   What did that case concern?

22       A.   A business that owed my business money.

23       Q.   Who -- And your business being Milestone?

24       A.   Not at the -- There's two Milestones that are

25   businesses that I've had, separate businesses.  One

1    called Milestone Bath Products Inc., and another one

2    called Milestone Bath Experts Inc., so Milestone is a

3    little confusing there.  But it was relating to

4    Milestone Bath Experts Inc.

5         Q.   Who was the other party?

6         A.   A company called Five Star.

7         Q.   Is that litigation ongoing?

8         A.   No.

9         Q.   During the deposition today we'll try to take

10   breaks periodically.  I usually aim for about once

11   every hour; if you need to break more often, please by

12   all means speak up.  Whenever -- We're happy to break

13   whenever you need to.  All I ask is that you answer any

14   outstanding questions before we break.  Is that okay

15   with you?

16        A.   I'm okay with that, yeah.

17        Q.   If I ask any --

18        MR. JEWELL:  Okay, excuse me.

19        MR. REMUS:  Yes?

20        MR. JEWELL:  This is Travis, the videographer.

21             Could the questioning attorney please speak

22        up, please?

23        MR. REMUS:  Sure.

24   BY MR. REMUS:

25        Q.   If I ask any questions today that you find to

1    be confusing or unclear, will you ask me to clarify

2    those questions?

3         A.   Yes, I will.

4         Q.   What is your educational background?

5    MR. HALVERSON:  Objection.  Form.

6         A.   My background after -- after public school is

7    I'm a Civil Engineering Technologist.  I went to

8    college for three years.

9         Q.   Where did you go to school?

10        A.   At Loyalist College.

11        Q.   Did you get a degree?

12        A.   I -- I did graduate.  They don't use the

13   degree here in -- in Ontario in the -- in the same way,

14   but I did -- I did graduate fully.

15        Q.   What is a Civil Engineering Technologist?

16        A.   A Civil Engineering Technologist is not a --

17   an engineer with a stamp but they -- a Civil

18   Engineering Technologist usually works under a Civil

19   Engineer and, you know, does all the beam calculations

20   for structures -- bridge structures, road structures,

21   buildings, high-rises; you know, civil -- Civil.  Every

22   -- Water and wastewater.  It's -- It's very broad.

23        Q.   Any other formal education?

24        A.   Some years later I was a graduate of a -- a

25   private course in running Kaizen events, which is a

1    continuous improvement, more related to manufacturing.

2         Q.   What all did that course involve?

3         MR. HALVERSON:  Objection.  Form.

4         A.   That -- That course involved training on how

5    to run what's called a Kaizen event, which is a

6    continuous improvement event where you take a large

7    group of people, generally in manufacturing, although

8    it can be in -- in other industries as well.  And the

9    company I was working for at the time hired a

10   speciality company to come and train me and run events,

11   and -- so that I would graduate and be able to run

12   those events for the company.

13        Q.   Do you have any specialized training with CAD

14   software?

15        A.   CAD software I used in college but never

16   since.

17        Q.   Do you have any specialized training with CNC

18   machines?

19        A.   I do not program CNC machines.  I'm very

20   aware of the capability of CNC machines all throughout

21   my -- my previous career.  I was involved in tooling; I

22   was involved in, you know, production using those type

23   of machines, but I'm -- I'm not a programer per se.  I

24   was a level up from that and we would have, you know, a

25   junior programer typically do the actual programing.

1          Q.   What was your first job after graduating

2     as a Civil Engineering Technologist?

3          A.   I worked for the Ministry of

4     Transportation Ontario, the Ontario Government.

5          Q.   What were your responsibilities in that

6     position?

7          A.   I was a Construction Inspector.  So when

8     we did, you know, multimillion-dollar construction

9     projects throughout the province, building brand-new

10    bridges for example; asphalt testing; you know, high

11    level inspection of -- you know, not day-to-day

12    activities but the multimillion-dollar projects that

13    the -- that the government worked on.

14         Q.   How long were you in that position?

15         A.   Seven years.

16         Q.   Do you remember the approximate years that

17    you were in that position?

18         A.   I was in that starting in 1991, I believe.

19         Q.   So about '91 to '98?

20         A.   It might have been '97, but in that range

21    for sure.

22         Q.   What was your next job after that?

23         A.   After that I went to a company called

24    Deloro Stellite.

25         Q.   What did that company do?

1    A.   It was a high-end manufacturer, aircraft

2    products and -- You know, for example, the -- the

3    veins that are on turbine engines, we produced

4    those.  Parts for the oil industry that go miles

5    into the ground and a very speciality product.

6    Speciality -- The actual material is called

7    stellite; it's a very special material.

8        Q.   What position did you have there?

9        A.   I started there as a Technical Estimator

10   and then I moved -- was promoted to a Production

11   Planner in the Investment Casting Department and I

12   worked on all the job planning and supported the

13   staff through all aspects.  We had a large machine

14   shop that would machine the -- the parts to -- to

15   final spec.

16       Q.   Did you have any other positions at Deloro

17   Stellite?

18       A.   That was the two -- only two positions

19   generally, although I did some -- I did some sp- --

20   quite a few special projects for them.

21       Q.   When did you leave Deloro Stellite?

22       A.   1998 or '99.

23       Q.   How long were you there?

24       A.   Approximately two years.

25       Q.   What was your next position after Deloro

1    Stellite?

2         A.   After Deloro Stellite I worked at a

3    company in Port Hope called ESCO, E-S-C-O.

4         Q.   What does ESCO do?

5         A.   All manufacturing, multiple plants

6    throughout the world.

7         Q.   Is that the same ESCO that's based in St.

8    Louis?

9         A.   It very well could be.  They did -- They

10   do have a presence there.

11        Q.   What was your position at ESCO?

12        A.   I can't recall my title but it was in

13   production, planning, management.  Continuous

14   improvement would have been the -- the big piece of

15   it, and that is where I was trained on the Kaizen.

16        Q.   How long were you at ESCO?

17        A.   I was there one year.

18        Q.   Do you remember the approximate years that

19   you were there?

20        A.   2000.

21        Q.   What was your next position after ESCO?

22        A.   I was hired out of ESCO to a company named

23   PYROTENAX.

24        Q.   What does PYROTENAX do?

25        A.   PYROTENAX is also a manufacturer.  A very

1    different industry.  They produce fireproof high

2    heat electrical cables primarily for the oil

3    industry for their safety equipment.

4         Q.   What was your position at PYROTENAX?

5         A.   Continuous improvement, engineering.  Like

6    continuous improvement is -- is engineering but it's

7    more process engineering.

8         Q.   What years were you at PYROTENAX?

9         A.   In the 2001/2002 range.

10        Q.   And what was your next position after

11   PYROTENAX?

12        A.   That is when I was fully self-employed.

13        Q.   And what did you do when you were self-

14   employed?

15        A.   In 1996 I started a bath remodelling

16   company.

17        Q.   What was the name of that company?

18        A.   Bath Solutions, which later became

19   Milestone Bath.  I did a branding change but the

20   same corporation.

21        Q.   So which -- You mentioned a couple of

22   Milestones earlier.  Which Milestone did Bath

23   Solutions become?

24        A.   Milestone Bath Experts Inc.

25        Q.   Do you recall when that name change took

1    place?

2           A.    In 2013.

3           Q.    Why did the name change?

4           A.    I had used that brand for multiple

5    companies and franchised that business.  The -- So

6    the franchise -- When I sold the franchising entity

7    they took the brand, so I rebranded.  So that was in

8    2013.

9           Q.    What was the business of Bath Solutions?

10          A.    Bath Solutions -- The brand Bath

11   Solutions, even though it was two different entities

12   -- one did franchising, collected royalties, and --

13   and offered up systems and product to a small group

14   within Canada of franchisees.  The Bath Solutions

15   Inc., again now Milestone Bath Experts Inc.,

16   continued to do local renovations in the

17   Belleville/Kingston area, and did wholesale sales to

18   the franchisees and -- and other customers of bath-

19   related products, and that is -- in that period we

20   began manufacturing some of our own products and --

21   as well as buying products from other companies and

22   wholesaling them.  Approximately 10,000 products

23   sold.  We certainly didn't make 10,000 products.  We

24   manufactured some and purchased and resold other

25   products.

1      Q.   Which -- Which products were manufactured

2   by either Bath Solutions or Milestone Bath Experts?

3      A.   Acrylic bath and shower wall systems and

4   the accessories to go along with them.

5      Q.   When was Milestone Bath Products Inc.

6   formed?

7      A.   Approximately 2008.

8      Q.   And what was the reason for forming

9   Milestone Bath Products Inc.?

10      A.   The reason was to separate the renovation

11   business from the manufacturing and wholesale

12   business.

13      Q.   Does -- Bath Solutions no longer exists

14   today, correct?

15      A.   The brand or the company?  I'm not clear.

16      Q.   The company.  Does the company Bath

17   Solutions exist today?

18      A.   Bath Solutions Inc. changed its name to

19   Milestone Bath Experts Inc. and it does still

20   continue today, yeah.

21      Q.   And -- Scratch that.  What was your

22   position with Bath Solutions Inc.?

23      A.   I was the founder and CEO.

24      Q.   What was your position with Milestone Bath

25   Experts Inc.?

1    A.   It's -- That's the same company, same

2    position.

3    Q.   And what is -- was your position with

4    Milestone Bath Products Inc.?

5    A.   The CEO.

6    Q.   Were you also the owner of Milestone Bath

7    Products Inc.?

8    A.   No.

9    Q.   Who was the owner of Milestone Bath

10   Products Inc.?

11   A.   My wife, Catherine Whitley.

12   Q.   Sitting here today do you have any

13   positions with either Milestone Bath Products Inc.

14   or Milestone Bath Experts Inc.?

15   A.   My position with Milestone Bath Experts

16   Inc. is retired.  My position with Milestone Bath

17   Products Inc. is President.

18   Q.   You mentioned that previously you were the

19   CEO of Milestone Bath Products Inc.  Was that at its

20   inception that you were the CEO?

21   A.   Yes.

22   Q.   Okay.  And eventually that title changed

23   from CEO to President, is that correct?

24   A.   Correct.

25   Q.   When did that change?

1        A.   That changed just over a year and a half

2    ago.

3        Q.   What was the reason for that change?

4        A.   My wife sold the shares of the business.

5        Q.   Who did she sell those shares to?

6        A.   There's a numbered company that I can't,

7    obviously, recall the number, but Ian Langdon is now

8    the CEO.

9        Q.   Is Mr. Langdon the current owner of

10   Milestone Bath Products Inc.?

11       A.   Yes.

12       Q.   Do either you or your wife currently have

13   any ownership interest in Milestone Bath Products

14   Inc.?

15       A.   No.

16       Q.   Is there a company by the name of

17   Bellastone Bath Systems?

18       A.   Not a company, no.

19       Q.   What is Bellastone Bath Systems?

20       A.   Bellastone is a trademark owned by

21   Milestone Bath Products Inc.

22       Q.   When was that name created?

23       MR. HALVERSON:  Objection, form.

24       A.   I don't recall a date, an exact date on

25   that or -- or year.  I would say approximately five

1    years ago.

2         Q.   Why was that name created?

3         A.   Just marketing purposes as a product

4    brand.

5         Q.   Was the name Bellastone used with a

6    particular category of products?

7         A.   All of the acrylic wall systems and the

8    accessories that go along with that would be branded

9    as Bellastone.

10        Q.   Have you had any either positions or

11   ownership interests in any bath product companies

12   other than Bath Solutions Inc., Milestone Bath

13   Experts Inc., and Milestone Bath Products Inc.?

14        A.   Bath Solutions Franchising Corp., I was

15   the owner of that as well.  The official -- The

16   official business name was Bath Solutions Dealership

17   Corp. Inc.

18        Q.   Are you currently employed by any company

19   today other than Milestone Bath Products Inc.?

20        A.   No.

21        Q.   What are your responsibilities as the

22   President of Milestone Bath Products Inc.?

23        A.   I run the day-to-day operations at a high

24   level.  A manager under me that runs the -- the

25   minutiae of the business.  I do the technical work

1     within the business, so any technical problems that

2     we have I'm usually the -- the troubleshooter and

3     coming up with the solutions for those things.

4          Q.   What was your reason for getting into the

5     bath products business in '96?

6          A.   The -- My position with the Ontario

7     Government, with the Ministry of Transportation, we

8     had a government change.  The Harris Government came

9     into Ontario.  They laid off 10,000 public servants

10    and I was foolish enough to decide to get into

11    business for myself.

12         Q.   And so you were doing your remodelling

13    business with Bath Solutions at the same time you

14    were also working for a number of these companies we

15    discussed earlier today?

16         A.   That's correct.

17         Q.   Okay.  And then you committed full-time to

18    your bath remodelling business in approximately 2002

19    after you left PYROTENAX?

20         A.   That's exactly correct.

21         Q.   Okay.  Why did you make that decision?

22         A.   PYROTENAX sold their business to another

23    company, General Cable I believe it was, and they

24    had some layoffs happening.  I was a victim of the

25    layoff and that was my decision that I would -- The

1    bath renovation business was very successful at that

2    point in time.  I decided that it was -- it was time

3    to -- to go full-time at that.

4         Q.   When did Bath Solutions first start

5    manufacturing its own products?

6         A.   Approximately 20 years ago.

7         Q.   So approximately 2003?

8         A.   In -- In that range.  Definitely fif- --

9    Definitely over 15 years ago.  In between 15 and 20

10   years ago.

11        Q.   Do you recall the first product that Bath

12   Products -- or I'm sorry, Bath Solutions

13   manufactured?

14        A.   I would think it was the accessories to go

15   along with the acrylic wall systems is where we

16   started.

17        Q.   In 2003 was Bath Solutions manufacturing

18   its own acrylic walls?

19        A.   It -- Definitely in the 15- to 20-year

20   range.  I -- I cannot pinpoint an exact year but in

21   that range.

22        Q.   Can you describe for me the acrylic walls

23   that Bath Solutions first started manufacturing 15

24   to 20 years ago?

25        A.   We began with a -- a white plain smooth

1    sheet of acrylic made -- made to our particular

2    specification, and colors and thicknesses, and those

3    kind of things.

4        Q.   Did those sheets have simulated tile

5    patterns on them?

6        A.   Not at that time.

7        Q.   When was the first time that Bath

8    Solutions or one of the Milestone entities sold --

9    or excuse me, manufactured an acrylic bath wall with

10   simulated tile patterns?

11       A.   Twelve to 15 years ago.

12       Q.   How were those patterns formed on the

13   acrylic sheets?

14       A.   We produced a mold that had the

15   representative tile patterns for vacuum-forming.

16       Q.   How did that molding process work?

17       A.   It's a tool that's produced.

18       Q.   How does the tool work?

19       A.   The -- Well, the tool itself is static and

20   -- and is the reverse impression of the product

21   itself, of the finished product, it's the reverse

22   impression.  The process itself, if that's what

23   you're asking me, works with a large oven.  The

24   sheet is heated; it's placed over the mold; vacuum

25   is applied, it forms the semi- -- semi-flexible

1    sheet into the finished product.

2         Q.   How long did either Bath Solutions or the

3    Milestone entities manufacture simulated tile walls

4    using the molding process you just described?

5         A.   From then and to -- and currently we still

6    do.

7         Q.   Was there a point in time where Milestone

8    or Bath Solutions started using a different process

9    to create simulated tile bath walls?

10        A.   Yes.

11        Q.   When was that?

12        A.   2014.

13        Q.   And what is the new process that -- And

14   actually in 2014 Bath Solutions Inc. was -- did not

15   exist anymore, right?

16        A.   The -- The corporation still existed, it

17   was just rebranded as Milestone Bath Experts Inc.

18        Q.   Okay.  Who was manu- -- So in 2014 who was

19   manufacturing the acrylic walls using this new

20   process?

21        A.   By that point the businesses had been

22   separated, and it was Milestone Bath Products Inc.

23        Q.   What was the process that Milestone Bath

24   Products Inc. started using in 2014 to form the

25   simulated tile patterns on acrylic sheets?

1           A.    At that point we used a CNC machine, a

2    commonly available CNC machine, and grooved the --

3    grooved the grout lines into the sheets.

4           Q.    What was the manufacturer or model of the

5    CNC machine that you used?

6           A.    We used a -- a third party to -- or

7    initially, before we purchased our own CNC machine

8    to do the -- to do the production.

9           Q.    Who was that third party?

10          A.    A -- A company named Optima.

11          Q.    Do you know the CNC machine that Optima

12   used?

13          A.    I do not know the -- the brand or model.

14   It was a commonly available machine.  It wasn't a

15   specialty -- You know, it wasn't something they made

16   or anything like that, it was just a common machine.

17          Q.    Who is Optima?

18          A.    They are a -- a manufacturing and printing

19   company in the Ottawa, Ontario area.  I think -- I

20   believe they're just across the -- just across the

21   border into Quebec actually.

22          Q.    And in -- in 2014, was it Optima who was

23   manufacturing the acrylic bath walls with a

24   simulated tile pattern for Milestone bath products?

25          A.    Yes.

U.S. Legal Support | www.uslegalsupport.com

1        Q.    When did they start that -- When did they

2    start manufacturing those panels?

3        A.    In -- In 2014.

4        Q.    When did Milestone Bath Products start

5    selling the products that Optima was manufacturing

6    for Milestone Bath Products?

7        A.    I don't know the exact month but it was

8    early -- early 2015, I believe.  We may have sold

9    some in 2014.  Trial runs or testing for the then-

10   related renovation business that I owned may have

11   done some installs as testing and learning about the

12   product.  We may have done that but --

13       Q.    Do you know the month in 2014 that Optima

14   first made a bath wall with a simulated tile pattern

15   made used a -- using a CNC machine?

16       A.    I don't recall an exact month.

17       Q.    Did Optima send protypes of those walls to

18   you?

19       A.    Yes, and I've also attended their facility

20   as well.

21       Q.    Do you recall when you first received

22   samples of the tile walls made using a CNC machine?

23       A.    Specifically from Optima or from --

24       Q.    Yes.

25       A.    In 2014, but I, you know, I would say mid-

1    to late-2014.

2         Q.   Do you recall when you first visited

3    Optima to see the process live?

4         A.   I don't recall that.

5         Q.   Do you recall if it was 20?14 or 20?15?

6         A.   2013 or '14.

7         Q.   When did you first start working with

8    Optima on any project?

9         A.   2012, 2013, in that range.

10        Q.   And what work did Optima do for Milestone

11   Bath Products at that time?

12        A.   Research and development on the ability to

13   print patterns onto acrylic sheet and the simulated

14   tile CNC process.

15        Q.   Did the printed patterns involve using a

16   CNC machine to remove material?

17        A.   No.

18        Q.   When did work with Optima on creating a

19   simulated tile pattern using a CNC machine begin?

20        A.   Sometime in 2014.

21        Q.   Where did the idea to create a simulated

22   tile pattern using a CNC machine come from?

23        A.   That came from my work with Mark Domanico.

24        Q.   What -- What is the work with Mark

25   Domanico that you're referring to?

1          A.   Mark and I often worked on technical

2     projects together.  As you know, Mark with Luxury

3     Bath Systems at the time, and myself -- He's very

4     much an idea guy; I'm much -- much more of the

5     engineering, get-it-done guy.  So we often

6     collaborated on projects of -- of the -- really the

7     technical nature primarily, although sometimes on

8     software and other things that I had experience

9     with.

10          Q.   So did you have -- Strike that.  What did

11     you ask Optima to do with respect to simulated tile

12     walls made using a CNC machine?

13          A.   We sent them acrylic sheets, we had them

14     groove the sheets in a tile pattern, they printed

15     into the grout lines, they printed ink of different

16     colors, and we experimented with look and feel and

17     -- and fit and finish.

18          Q.   When did you send those acrylic sheets to

19     Optima?

20          A.   I can't recall an exact date there.

21          Q.   Did Optima come up with the idea to use a

22     CNC machine to create simulated grout lines?

23          A.   No.

24          Q.   What -- Why did you go to Optima to have

25     those sheets made as opposed to doing it yourself?

1    A.   The cost of equipment.  They already were

2    set up and using that equipment to -- for other

3    customers in other processes that they did, and they

4    had both the CNC machine and a very high-end Swiss

5    printer that -- for the second project we were

6    working -- or sort of -- they were inter- --

7    intermingled or comingled projects, the printing and

8    the grooving.  So they had the equipment, simple as

9    that.

10    Q.   Have you ever had an employment agreement

11   with either Milestone Bath Products Inc., Milestone

12   Bath Experts Inc. or Bath Solutions Inc.?

13    A.   I currently have -- Since my wife sold the

14   shares I currently have a consulting agreement with

15   Milestone Bath Products Inc.  But in the years that

16   I was the CEO, no.  I was the -- I was the -- I was

17   the -- My wife and I were the owners so there was no

18   need for that.

19    Q.   Are you the -- a named inventor on any

20   patents?

21    A.   Yes.

22    Q.   How many?

23    A.   Just one.

24    Q.   Do you recall what that patent relates to?

25    A.   It relates to a walk-in bathtub and the

1    ability to have a walk-in bathtub that splits apart

2    in two sections so that it fits easily into a home,

3    through the narrow doorways of a home.

4         Q.  Are you a named inventor on any patent

5    applications other than the one that eventually

6    became a patent that you just described?

7         A.  No.

8         Q.  Other than the tub patent that you just

9    mentioned, does Milestone Bath Products Inc. own any

10    other patents?

11         MR. HALVERSON:  Objection.  Form.

12         A.  No.

13         Q.  When did you first meet Mark Domanico?

14         A.  Approximately 20 years ago.

15         Q.  So about 2003?

16         A.  In -- In that range.  It's been a long

17    time.

18         Q.  What were the circumstances in which you

19    met Mr. Domanico?

20         A.  I did business with Luxury Bath Systems

21    out of Chicago.

22         Q.  What --

23         A.  And that -- Oh, sorry.  I was just going

24    to, I guess finish --

25         Q.  You can finish your answer.

1       A.    -- that little bit.  And -- And then he

2   was a shareholder of that company and did some work

3   with them.

4       Q.    What business did you do with Luxury Bath?

5       A.    I imported some of their products and

6   resold them in Canada.

7       Q.    And when you say you did it, was that

8   through your companies, either Bath Solutions or

9   Milestone?

10      A.    Yeah, it would -- would have been Bath

11  Solutions Inc. in the -- in those days.

12      Q.    What -- What products did you import from

13  Luxury Bath?

14      A.    Bathtubs, shower pans, acrylic wall

15  systems, some assimilated tile, all the accessories.

16      Q.    Do you recall if there were ever any

17  signed agreements in place between either Luxury

18  Bath on one hand, and then either Bath Solutions or

19  either of the Milestone entities on the other hand?

20      A.    We were the Canadian distributor and there

21  was a -- a basic buy/sell agreement there.

22      Q.    Any other agreements that you recall?

23      A.    No.

24      Q.    How did you meet Mark Domanico?

25      A.    Mark was not in the day-to-day operations

1    of Luxury Bath Systems at the time so it was -- it

2    was some time I had been dealing with Luxury.  And I

3    met Mark subsequent to that.  And it would have

4    either -- you know, it would have been a -- a

5    company event of some sort.  I would have either

6    been in Chicago at the plant there for some business

7    purposes, or it could have been a -- a business

8    social event, a cruise or something like that.  But

9    I don't -- I don't recall the exact time but it

10   would have been, you know, within the first two

11   years of meeting the company.  I really had not a

12   lot of interaction with Mark in the early years but

13   that's -- in that range around 20 years ago, anyway.

14        Q.   Was -- Was there a point where your

15   interaction with Mark became more substantial?

16        A.   Yes.

17        Q.   When was that?

18        A.   Within -- Within a few years of meeting

19   Mark.  I -- It -- I got to know him better, and I

20   think by then my reputation was -- was out there,

21   that I was a technical person.  So Mark and I would

22   have technical conversations about problems with

23   their products and I was assisting them with, you

24   know, solving some of the issues in their

25   manufacturing plant.  My, I guess two things; my

1    engineering background and my manufacturing

2    experience, but also the fact that I had started a

3    bath remodelling company from the ground up.  So I

4    understood what it was like to actually do it in the

5    real world, whereas they predominantly were just

6    manufacturing, they didn't have that real world

7    experience.  So as my other company, Milestone Bath

8    Experts, was using their product, often there were

9    lots of room for improvement.  So I often, you know,

10   fed that back and had discussions with Mark and some

11   of the other people at the business.  Yeah, on those

12   things.  Mark was not -- Mark was not at the

13   facility most times unless there was a special

14   event.  He lived in Florida at the time.

15        Q.   Do you know how many times you've met Mark

16   in person?

17        A.   I don't know an exact number, but dozens.

18        Q.   When was the last time that you met Mark

19   in person?

20        A.   September this year.

21        Q.   And what did you discuss at that time?

22        A.   We discussed this legal issue, the patent

23   legal issue, as well as I visited a company that he

24   works with currently that's in the manufacturing

25   space.  So we talked about selling each other --

1    selling product to each other, those type of things.

2        Q.   What did you discuss with respect to the

3    legal issue concerning this case?

4        A.   The main purpose was to reconnect with

5    Mark.  There was a number of years I had not spoke

6    with Mark and that's why reconnecting with him was

7    important to me, and explained the situation,

8    explained certainly my position on the -- on the

9    patent matter; learned a bit from him on some of his

10   recollection.  That was the purpose.  Had lunch,

11   flew back home.

12       Q.   When was the last time you spoke with Mark

13   Domanico prior to September 2023?

14       A.   There was several phone calls leading up

15   to that meeting, but prior to that, 2014 or '15.

16       Q.   Did you have any communications with Mark

17   Domanico between 20?15 and 20?23?

18       A.   Not that I can recall.

19       Q.   And what did you hope to accomplish by

20   speaking with Mark about the legal issue in this

21   case?

22       A.   I had hoped that he would recall better.

23   On the -- on the phone -- Mark's -- Mark's getting a

24   little advanced in age and I just felt that if we

25   talked about it, and hopefully he recalled more

1    about it.  I wanted to learn more about it from his

2    end as well, of what his recollection was, or his

3    perception was.  Yeah, so that -- that was -- that

4    was the main purpose; to reconnect with him knowing

5    that this process was -- was moving forward and --

6          MR. REMUS:  Take a --

7          MADAM REPORTER:  Just pause.

8          MR. REMUS:  We can take a break, yeah.

9                    (PAUSE)

10         MADAM REPORTER:  Continue.

11   BY MR. REMUS:

12         Q.  Did you share with Mark your recollection

13   of the development of simulated tile sheets using a

14   CNC machine?

15         A.  Very lightly and generally I did, yes.

16         Q.  What -- What do you mean by lightly and

17   generally?

18         A.  At that point we were just reconnecting,

19   so it wasn't very in-depth of a conversation.

20         Q.  Did you -- Did he agree with your

21   recollection of the events regarding simulated tile

22   sheets made using a CNC machine?

23         A.  He did not object or argue or contradict

24   any -- any of my recollection.  He had some pieces

25   that, you know, were not ever part of my

1    recollection because I wasn't there.  He discussed,

2    you know, some discussions with his lawyer and how

3    it -- you know, how he came up with the concept with

4    a nametag, seeing a nametag, and wondered if that

5    could -- could happen.  And he told me -- I -- I --

6    I questioned him regarding why he didn't discuss

7    with me that there was -- you know, he intended to

8    patent it or do anything.  And he answered that

9    because he didn't -- did not intend to.  He -- So

10   that was kind of -- It was -- It was fairly light.

11   Intentionally it was not designed to be any sort of

12   a, you know, confrontational or highly detail-

13   orientated, or it was just really an introductory

14   getting to know each other again.  And -- And fifty

15   percent of the visit was really into, you know,

16   future -- it's not his business but he had --

17   introduced me to a friend of his that -- that we may

18   do some business with, so --

19        Q.   In your experience working with Mr.

20   Domanico have you found to -- him to be an honest

21   person?

22        A.   No.

23        Q.   In what way?

24        A.   He's lied to me.

25        Q.   When?

1          A.   Well, when we were the Canadian

2     distributor and he sold product around my company,

3     and sat at my desk in Belleville at my office, and

4     lied that it didn't happen until I showed him all

5     the Customs documents that were sent to my company

6     in error that proved it.

7          Q.   What company was he selling to around you?

8          A.   It was a company in Montreal area.  I

9     think they were called Southshore something but I

10    can't remember their exact name now.

11         MR. REMUS:  Did you -- Let's just do this.

12         Can we mark that as Exhibit 1?

13          Oh, I'm sorry, do you have stickers?

14         MADAM REPORTER:  Yes, here, yes.  It'll take a

15         second.

16         MR. REMUS:  That's fine.

17         MADAM REPORTER:  Do you have a preference?

18         MR. REMUS:  No, lower right's fine.

19         (Whereupon J. Whitley Exhibit No. 1 was marked)

20    BY MR. REMUS:

21         Q.   Mr. Whitley, I'm handing you a copy of a

22    document that we've marked as Exhibit 1.  This is

23    U.S. Patent 10,144,243.  Have you seen this patent

24    before?

25          A.   I have.

1      Q.   And you recognize this as the patent that

2   is at issue in this case between BCI and Milestone,

3   correct?

4      A.   Yes.

5      Q.   And this is the patent on which you

6   believe you are a -- or should be a named inventor?

7      A.   Correct.

8      Q.   Did you -- When you spoke to Mr. Domanico

9   did you share with him your belief that you thought

10   you should be a named inventor on this patent?

11      A.   Yes.

12      Q.   And what was his response?

13      A.   I think his response was that he didn't

14   know.

15      Q.   Did you ask him to support your claim of

16   inventorship for this 243 patent?

17      A.   Not directly, no.

18      Q.   How many conversations have you had with

19   Mr. Domanico about this lawsuit?

20      A.   Approximately ten.

21      Q.   And the first one was in September 20?23?

22      A.   No, it was earlier than that.  We had some

23   discussions, some phone discussion, prior to my in-

24   person visit.

25      Q.   Okay.  How many -- Has there only been one

1    in-person meeting to discuss this lawsuit with Mark?

2         A.   Yes.

3         Q.   Okay.  So the other approximately ten

4    discussions were all by phone?

5         A.   Correct.

6         Q.   How many telephone discussions did you

7    have before your in-person meeting with Mark?

8         A.   I -- I can't recall an exact number.  If

9    you want me to take a stab at it I will but I -- I

10   don't remember an exact number.

11        Q.   Do you recall speaking with him by phone

12   after your meeting with him in person?

13        A.   I have spoke with him after the -- that

14   in-person meeting.

15        Q.   When was your most recent conversation

16   with Mark about this lawsuit?

17        A.   Last Wednesday afternoon.

18        Q.   Was that after his deposition?

19        A.   Yes.

20        Q.   Okay.  What did you discuss at that time?

21        A.   He called me.  He asked me about

22   production issues with his friend's business that --

23   No- -- Nothing to do with the patent issue.  And the

24   -- It was a short call.  It was only two -- two or

25   three minutes.  At the end of the call he did bring

1    up the patent issue and said he hoped it could be

2    resolved soon and was hoping that BCI would work

3    with us to settle.  But there was not really a di-

4    -- what his -- his statement about that; it really

5    wasn't a back-and-forth discussion on that.

6         Q.   On that phone call after his deposition

7    did you discuss at all your claim that you should be

8    a named inventor on the 243 patent?

9         A.   No.

10         Q.   Have you communicated with Mr. Domanico

11    via email concerning this lawsuit?

12         A.   There -- There would be some basic setting

13    up the meeting in September and things like that.

14    Mark is not much for email, or texting for that

15    matter.

16         Q.   Do -- Do you recall any substantive

17    communications with Mark about this lawsuit via

18    email other than just setting up meetings?

19         A.   No.

20         Q.   Did you prepare a Declaration that you

21    wanted Mark Domanico to sign in connection with this

22    case?

23         A.   We -- Mark and I had a meeting, a phone

24    meeting, a long one, over an hour long, where we

25    decided that we would then -- you know, in much more

1    detail than any of our other conversations,

2    including the in-person one -- we didn't really get

3    into any detail.  We decided to -- to share with

4    each other our more detailed recollections so we did

5    set up a -- a phone call.  I believe it was on a

6    Sunday, and we both took turns at sharing our -- our

7    recollection of the events surrounding the -- the

8    grooving and the CNC project.  And it was following

9    that -- Knowing -- Knowing -- Knowing Mark, I did

10   type up my own as well as kind of recanted (sic)

11   that -- that long phone meeting back to him and

12   asked him to verify if that was his understanding of

13   the -- what he had just spoke about the few days

14   before that.

15        Q.   That one-hour phone call that you're

16   describing, do you recall if that was before or

17   after the in-person meeting?

18        A.   I believe it was after.

19        Q.   And you made a comment about how after

20   your discussion, the one-hour discussion with Mark,

21   you recanted (sic) the -- your recollection of

22   events and you -- you said something about ?knowing

23   Mark?.  What -- What were you referring to when you

24   said knowing Mark and that's why you did that?

25        A.   Well, I'm a little hesitant to -- I'm not

1    here to, you know, be negative about Mark but he's

2    not one to necessarily follow through with things

3    even if he promises to do it.  Knowing his -- a

4    little bit of his age and the situation, he's -- he

5    is struggling with cancer and going through

6    treatments, so I -- I guess as encouragement to

7    actually get something done I was trying to help

8    him.  Be -- Be the secretary of it, I guess is maybe

9    the -- the better way to say it.

10        Q.   And is that when you drafted a Declaration

11   for Mark Domanico to sign?

12        A.   I -- Yeah, I don't know if it was in the

13   form of a Declaration per se at that point, but I

14   just like, you know, it'd be fair to try to recant

15   (sic) his conversation from that call.

16        Q.   Mr. Whitley, I'm going to hand you what

17   we've marked as Exhibit 2, which is titled

18   Declaration of Mark Domanico.

19        (Whereupon J. Whitley Exhibit No. 2 was marked)

20             Have you seen this Declaration before?

21        A.   I don't know.  This is not a signed

22   Declaration.  Is this his actual Declaration or

23   something different?

24        Q.   I -- I agree with you that it's not a

25   signed Declaration.

1    A.    Is this his formal Declaration --

2    Q.    I --

3    A.    -- in the end --

4    Q.    I am not aware --

5    A.    -- or is this --

6    Q.    I'm not aware of a formal Declaration.  If

7    you're aware of one --

8    A.    Okay.

9    Q.    -- we can consider that one too.  Are you

10   -- Are you -- Let me ask you this.  Are you aware of

11   any signed Declarations from Mr. Domanico?

12   A.    I'm not.

13   Q.    So Exhibit 2, have you seen this

14   Declaration before?

15   A.    I can't answer that without taking some

16   time to read through it, and I don't know where this

17   has come from, so --

18   Q.    Do you recog- --

19   A.    Can you -- Can you help me with where this

20   has come from?  Then I can probably answer it more

21   accurately.

22   Q.    Is this a document that you created?

23   A.    No.

24   Q.    Have you -- And -- And if you need to take

25   time to read the Declaration you can certainly do

1    that.  Have you ever seen this Declaration before?

2         A.   I -- I don't know offhand.

3         Q.   Okay.  Do you need time to review the

4    Declaration so you can answer that question?

5         A.   Well, the problem with the document is I

6    don't know if anything's been changed or modified or

7    -- I -- I don't know.  It looks similar to -- It

8    looks similar to some of the draft.  I would not

9    have drafted the BCI Acrylic Inc. and those kind of

10   things, so -- on, on there.  But the rest of it

11   looks like -- It does look like it's the result of

12   that hour-long phone conversation.

13        Q.   And does this look like something that you

14   prepared?

15        A.   Not the entire document but certainly

16   portions of it.

17        Q.   What portions did you prepare?

18        A.   The text, you know, the -- the -- the

19   bullet-points pieces.  Certainly not the -- the

20   header and the case number and those things.  I did

21   not apply those to it.

22        Q.   And I -- I'm not seeing any bullet points.

23   I just want to clarify.  Are you referring to --

24        A.   Well, one, two --

25        Q.   -- the number --

1         A.   Yes, the numbered --

2         Q.   The numbered paragraphs?

3         A.   Yes.

4         Q.   Okay.  So the numbered paragraphs are your

5  creation?

6         A.   Yeah, I'm not sure.

7       MR. HALVERSON:  Objection.  Form.

8         A.   I'm not sure if it's been modified at this

9  glance, but it looks similar.

10        Q.   When did you prepare this Declaration?

11       MR. HALVERSON:  Objection.  Form.

12        A.   Very shortly after the phone call.  So

13  that would have been -- I'm going to say it was

14  October 20?23.

15        Q.   Did you send this Declaration to Mr.

16  Domanico?

17        A.   Yes.

18        Q.   Did you send it to him by email?

19        A.   I believe so.

20        Q.   Did you send -- Do you recall if you sent

21  multiple versions of this Declaration to Mr.

22  Domanico?

23        A.   I do not believe I sent multiple versions.

24  I may have resent -- vaguely he was -- couldn't find

25  it or doing something.  I may have re-sent it but I

1     don't believe it was multiple versions.

2          Q.   Did Mark respond via email to the email

3     where you sent this draft Declaration to him?

4          A.   I don't recall if he responded via email.

5     Mark is often one to just phonecall.  So it may have

6     been a conversation over the phone that he was going

7     to review it and go from there.

8          Q.   Did you -- After you sent this Declaration

9     to Mark did you subsequently discuss the Declaration

10    with him by phone?

11         A.   Not in detail of what it contained or

12    anything like that.  I believe he's referred to it a

13    few times, that he would, you know, be reviewing it

14    and making, you know, any editing he needed to make

15    and would look at sending it back.  But I -- He --

16    If it did come back, it didn't come back to me.

17         Q.   To the best of your knowledge has Mr.

18    Domanico ever agreed to sign this Declaration?

19         A.   Not to my knowledge, but he also has not

20    refused to -- to sign it either.  I think he just

21    wasn't sure what to do.

22         MR. REMUS:  We've been going for about an hour,

23         why don't we take a short break.  We can go off

24         the record.

25         MR. JEWELL:  Going off the record.  The time is

1          now 15:10 UTC.

2                          (OFF THE RECORD)

3          MR. JEWELL:  Back on the video record, the time

4          is now 15:18 UTC.

5     BY MR. REMUS:

6          Q.   Mr. Whitley, the phone calls and one in-

7     person meeting that you had with Mr. Domanico

8     concerning this litigation, was anybody else

9     involved in those discussions other than you and Mr.

10    Domanico?

11         A.   The visit to Chicago, Ian Langdon was

12    there for that meeting as well.

13         Q.   For any of the other discussions was there

14    anybody present?

15         A.   The hour-long phone meeting, Erik

16    Halverson was on the call as well.

17         Q.   Anybody else on that call?

18         A.   No.

19         Q.   Anybody else present at any of the other

20    discussions you've had with Mr. Domanico about this

21    litigation?

22         A.   Yes, a gentleman by the name of Mark Smith

23    who owns the company that Mark is -- Doesn't -- He

24    doesn't work there, he's helping his friend in the

25    -- in the bathroom manufacturing business.  He was

1    there for the lunch meeting conversation.

2         Q.   For the in-person meeting that Mr. Langdon

3    attended, did he participate at all in the

4    discussions that actually pertained to this case?

5         A.   Yes.

6         Q.   What did he say?

7         A.   Did Mr. Langdon say?

8         Q.   Yes.

9         A.   I can't -- I can't recall exactly.  It

10   might have been more just questions on the details.

11        Q.   Was there -- Strike that.  Are you

12   currently doing any business with Mr. Domanico?

13        A.   No.

14        Q.   One of the projects that has been

15   mentioned that you worked on with Mark Domanico is

16   printing simulated marble on acrylic sheets.  Do you

17   recall that project?

18        A.   Yes.

19        Q.   What was the idea behind printing

20   simulated marble on acrylic sheets?

21        MR. HALVERSON:  Objection.  Form.

22        A.   The main purpose was to try a -- a new

23   printing -- not really a new printing process but

24   new for our industry, where we could -? Oh, sorry, I

25   thought I had everything shut off here.  There we

1    go.  The idea was to be able to print a digital file

2    as opposed to a -- an old-fashioned printing process

3    with rollers, which is gravure process, which would

4    give the advantage being able to literally print

5    anything you can come up with digitally.  No -- No

6    different than you would on your computer screen at

7    home and print on an inkjet printer.  It would give

8    us the ability to print anything more complicated

9    that the gravure process could not do, as well as

10   being able to print in much smaller volumes.

11        Q.   Who came up with that idea?

12        A.   I don't recall that.

13        Q.   What were your contributions to that

14   project?

15        A.   I was printing samples in Canada; Mark was

16   printing samples in -- in the U.S.  And the primary

17   challenge of that project -- You know, print -- the

18   printing wasn't the challenge; the challenge was

19   protecting the -- the inks in a -- you know, in a

20   shower situation as you can imagine, that?s water

21   and humidity and people scrubbing it.  So the -- the

22   primary challenge was protecting the ink and -- so

23   that it would be durable and last 25 or 30 years in

24   a shower environment.  That was the challenge we

25   were working on.  So I had been testing and trying

1    different lamination methods to try to, you know,

2    protect that ink, and Mark was doing the same on his

3    end, and then we would share the samples and talk

4    about the pros and cons of -- in -- in that case,

5    why it would -- why it was not good enough to go

6    into the real world production.  At that point in

7    time that project was not successful.

8         Q.   Why wasn't it successful?

9         A.   Primarily Duratint air voids under the

10   laminate films.  Because everything in our industry

11   is typically high gloss, you know, it's like a speck

12   of dirt on the Ferrari finish.  It just stands out

13   like a sore thumb.  We were -- just could not find a

14   way to get it to look, you know, 99 out of a hundred

15   percent.  We just could not get there at that point

16   in time to -- to find any suitable way.  We tried

17   coating, we tried coating it with automotive type

18   clear coats, we tried various laminates, different

19   equipment to -- to do the lamination because that

20   can sometimes make a big difference.  We tried

21   laminating under heat and pressure.  That project in

22   -- in that form never came to fruition.  That one,

23   we -- we worked on that for quite a while.

24        Q.   Were you and Mark working on different

25   solutions to that problem of protecting the ink?

1     A.   Yes.

2     Q.   What solutions were you working on?

3     A.   The ones I just suggested.  The -- The

4    clear coating with the automotive finish, I had that

5    type of equipment, and the lamination solution as

6    well.  I'd gone to multiple companies and run trials

7    and never -- nothing ever came out that I was happy

8    with of -- of that, unfortunately.

9     Q.   What solutions was Mark working on for

10   protecting the ink?

11    A.   I believe he was laminating, trying

12   different laminators as well.

13    Q.   Was there any agreement in place between

14   either you and Mark or your respective companies

15   with respect to this project?

16    A.   No.

17    Q.   Was there ever any discussion about having

18   an agreement in place?

19    A.   No.

20    Q.   Do you have any notes or -- or lab

21   notebooks from that time concerning your work on the

22   simulated marble acrylic sheets?

23    A.   No.  These projects were not complicated

24   enough to -- to -- to have a necessity for those

25   type of things.

1    Q.   Did Mark ever send you samples of his

2    efforts to create these simulated marble sheets?

3    A.   Yes.

4    Q.   Do you recall how many times he did that?

5    A.   I -- I think we met multiple times.  Some

6    of it?s in-person and then some is -- he would just

7    put the samples on our -- If we were buying material

8    and, you know, just normal product to resell, he

9    would just throw it on the shipment and we would --

10   it would get to me that way, in an envelope.

11   Q.   And did you send him samples of what you

12   were working on?

13   A.   I don't recall like couriering him

14   product, but I do recall at least once he was

15   physically at my facility and we were going over the

16   -- my results.  I may have taken -- I may have taken

17   samples in person in -- you know, during a visit to

18   -- to their facility, but I -- I say I may have.

19   But I don't recall shipping anything out to him by

20   courier.  It may -- If -- If anything it was in

21   person.

22   Q.   Did you have any type of non-disclosure

23   agreement in place with Mr. Domanico or Luxury Bath?

24   A.   No.

25   Q.   Why not?

1        A.    It never -- It was never part of the

2   process.  You know, according to, well, certainly my

3   -- my understanding of -- You know, just to use

4   these two projects that we're talking about as an

5   example, you know, there was no intention to -- to

6   patent them at the -- at -- certainly at that time.

7   I was surprised to find out years later that this

8   had in fact happened.  Mark knew we manufactured; I

9   certainly knew they manufactured.  They were never

10  -- Mark in particular, but even their -- even their

11  company, even the CEO at the time of the company,

12  they were really very open with all their

13  technology.  They didn't -- They didn't care if --

14  you know, to protect those kind of things.

15       Q.    Well, is the same true for Milestone, that

16  Milestone did not care to protect those things?

17       A.    Those particular things, we did not care

18  to protect them.  In particular the -- the grooving

19  project.  It's somewhat laughable to me that the

20  patent actually got approved because it's, you know,

21  a standard piece of equipment.  I would have never

22  imagined that that was patentable.  Mark said the

23  same thing to me.  But that's -- In the end here we

24  are, so -- At that point in time it didn't feel like

25  anything was there to protect.  Things like the

1    walk-in bathtub that -- that I was successful

2    getting a patent on, that was different.  We knew

3    that was very special.  Nobody else had done

4    anything even similar and, you know, I protected

5    that, did not share that with anybody.  Yeah, it --

6    That would -- So I knew what was -- needed to be

7    protected and not.

8           I think Luxury Bath as well as  -- as

9    Milestone Bath Products, that's not really the --

10    you know, the -- the normal process for us to patent

11    something that's new, that's just sort of us -- you

12    know, small evolutions.  So that's just not normal

13    process for us.

14    Q.   In -- In your opinion is there anything

15    inventive or patentable about the 243 patent?

16    A.   Are you asking me if -- if this patent

17    should have been ?- or, sorry, this -- this patent

18    should have been approved?

19    Q.   Yes.

20    A.   Are you asking me that?  I -- That's

21    beyond my expertise at that point in time.  I can

22    tell you that neither Mark nor myself believed it

23    was patentable during that time.  We had no

24    discussions at all regarding the possibility of

25    patenting it or being a -- you know, anything of any

1    significance.

2        Q.   Okay.  Do you think there's anything

3    inventive or patentable that's described in that

4    patent, in the 243 patent?

5        A.   Well, I think the answer that it's been

6    approved would be my -- that I would have to say at

7    this point in time it was approved.  We have --

8    obviously have dispute over that.

9        Q.   Okay.  Do -- Do you agree that it should

10   have been approved?

11       A.   I do not agree that it should have been

12   approved.

13       Q.   Why?

14       A.   Because there's a -- It's just a -- a

15   natural evolution with an existing piece of

16   equipment.  It's just such a simple -- nothing --

17   there's really no technology involved here.

18       Q.   Is it your opinion that at the time that

19   application was filed that all of the concepts

20   described in there were well-known concepts?

21       MR. HALVERSON:  Objection.  Form.  It calls for

22       a legal conclusion.

23       A.   I would say that certainly the majority of

24   that is commonly available, equipment and processes.

25       Q.   Is -- Is there anything that was not

1    commonly available or well known?

2        MR. HALVERSON:  Same objection.

3        A.    I don't believe that there is anything

4    that's uncommon about that.

5        Q.    Did you have a non-disclosure agreement in

6    place with Optima?

7        A.    Yes.

8        Q.    Why is it that you had a non-disclosure

9    agreement in place with Optima but not with Luxury

10    Bath?

11        A.    Because they had the equipment to produce

12    pieces like this and the -- I was worried that they

13    would become a com- -- a competitor.  It wasn't

14    about a -- a patent issue, it was about them buying

15    acrylic sheet from a supplier and competing against

16    us, selling to their customer base.  Even though

17    they were not in our industry they were doing a --

18    another project that they were, you know, creating a

19    sales channel high-end product, selling to

20    architects and people like that.  So I was worried

21    that they would, you know, duplicate my business,

22    become a competitor.

23        Q.    Did you not have that same concern with

24    respect to Luxury Bath?

25        A.    No.  Luxury Bath, you know, at that point

U.S. Legal Support | www.uslegalsupport.com

1    in time we considered a, you know, a frie- -- very

2    friendly competitor; you know, partner, if you want

3    to use that term.  You know, they produced things

4    that we needed.  You know, it was a very friendly

5    relationship.  We had, you know, lots of things

6    going on there.  You know, Mark -- Mark has stayed

7    in my personal home with my family, met my family.

8    I've been to his home in Florida, for example.  So

9    just a very different relationship.  It wasn't

10   really threatening.  You know, if we developed

11   something and gave it to them, it didn't matter.  We

12   obviously used their products.  You know, it -- it

13   was just a very different relationship.

14        Q.   What -- When was that, that you stayed in

15   each other's homes?

16        A.   Oh, I did not -- I visited his home, I

17   didn't stay there.  Went for a barbeque with my

18   children and my wife during a trip to Florida.  His

19   home was in Orlando, so it was certainly -- that?s

20   where I was at the time, with my children.  But we

21   went over for a barbeque with his wife, and met his

22   mother-in-law and his mother, and had a nice

23   barbeque in his -- around his pool.  Geez, I can't

24   remember when that was.  I'm -- I'm going to say it

25   was likely in the 2000 and -- well, maybe I can

1    think of how old my children are in there.  I'm

2    going to say that was -- that was 15, 16 years ago I

3    visited him at his home.  I'm just going by my

4    youngest daughter, that I'm not picturing that she

5    was there, just my older two.  Went out for dinner

6    another time in Florida with Mark's wife Joanne, and

7    -- and my wife.  And then he was here -- It was

8    later on.  I'm going to say that was 2012.  It might

9    even have been into the winter of 2013 that he

10    stayed at my home.  We have a guest suite at my home

11    and he came and stayed, and -- which is not

12    something I offer up easily.

13        Q.   When was the first time you were aware of

14    the idea of forming simulated acrylic tile sheets

15    using a CNC machine?

16        A.   Early 2013.

17        Q.   And how did you become aware of that idea?

18        A.   Mark had the concept to -- to try that.

19    We bounced some ideas back and forth on how that

20    would happen.

21        Q.   What ideas were bounced back and forth?

22        A.   Just the -- the basic idea.  You know, the

23    name tag example.  What if we tried this, what would

24    that mean?

25        Q.   What -- What types of things were you --

1    you know, trying, what types of things?

2        A.  The big one being that he did not have to

3    make traditional vacuum-forming tooling, just a

4    computer program; you could change it up quickly,

5    you know, changeovers.  It would reduce all your --

6    all your setup time of molds.  So we talked about

7    those kind of things.

8        Q.  Do you recall whether or not you made any

9    suggestions to him for his idea?

10       A.  I think at that point we discussed that we

11    would, you know, do some -- do some rudimentary

12    tests and see what it looked like.

13       Q.  Do you recall what month in 20?13 this

14    was?

15       A.  I do not recall the -- the month.  Too

16    long ago now.

17       Q.  What was the next step in the process

18    after the initial discussion?

19       A.  I believe some time went by.  One of the

20    -- One of the things about Mark is he usually has a

21    hundred things on the go and the -- I think there

22    was some time went by.  And then -- And then we met

23    in person and looked at some of the first initial

24    samples which were -- were not very attractive.  And

25    that would have been -- Sorry, that would have been

1    a little bit later on in -- in the process.

2        Q.   Do you recall when that in-person meeting

3    would have been?

4        A.   I believe it was the winter of either --

5    either late 2013 or winter 2014.

6        Q.   Do you know where that meeting was?

7        A.   I believe at my facility here in -- in

8    Belleville.

9        Q.   So Mark travelled to your facility here in

10   -- in Belleville and brought samples with him?

11       A.   I believe so.

12       Q.   Do you recall how many samples?

13       A.   It would have been a -- a stack of pieces

14   of acrylic, it would not have been -- nothing full-

15   size, just some smaller pieces.

16       Q.   And what do you recall about those

17   samples?

18       A.   That they were not saleable, they were

19   rough around the edges, and I mean that literally.

20       Q.   Do they have sharp edges?

21       A.   Yes.

22       Q.   And those were the edges where the grout

23   lines are formed?

24       A.   Yes.

25       Q.   You know, what did you discuss at this in-

1    person meeting at your facility where Mark brought

2    these samples with him?

3        A.    Next steps to try to get a saleable

4    product.

5        Q.    What were those next steps?

6        A.    There may have been other things, but the

7    big ones -- certainly by, you know, some of the

8    documents and those things -- the big things were

9    the -- the depth of the cut, using a -- a bit that

10   would reduce the sharp edge.

11       Q.    Who made those suggestions?

12       A.    I did.

13       Q.    When did you make those suggestions?

14       A.    During that visit.  We had the discussion

15   in that winter.  So that either -- You know, just

16   based upon the weather, I remember the snow.  So it

17   would have been, you know, December through

18   February.  Rarely does it snow here in March.  It

19   could have been early March at the -- at the latest.

20   Afte that we really don't get much snow here.  But

21   we -- we had the discussion in person, and then

22   nothing happened and I kind of poked him again later

23   about it because I thought it was kind of a cool

24   project to do.

25       Q.    What was his response to those suggestions

1    that you made about the -- the depth of the cut and

2    using a different bit to remove the sharp edges?

3         A.   During the -- the in-person meeting?

4         Q.   Yes.

5         A.   He suggested he would give it a try.

6         Q.   Anything else discussed about those two

7    ideas?

8         A.   Not that I recall.  You know, the process

9    itself at that -- you know, is again not that

10   complicated.  So it was really -- That was kind of

11   the next evolution that I thought we should give a

12   try.

13        Q.   Why did you want to reduce the depth of

14   the cut?

15        A.   Visually it did not look realistic, but

16   that also was a factor of the sharp edges.

17        Q.   How did the sharp edges relate to the

18   depth of the cut?

19        A.   Basically your finger, when it goes --

20   when it goes down deeper it exposes more of the edge

21   on your -- on your skin.  You know, if you look at

22   a, you know, traditional tile job, the grout's not

23   that deep when the -- when the tile-setter sets it

24   in.  So it was really a matter of trying get that --

25   the fit and finish and that sharpness out of the --

1    out of the grooving process.

2         Q.   Do real grout lines have rounded edges?

3         A.   Typically.  It depends on the tile, it

4    depends on the tile setter, how they finish it.

5    That's a craftsman issue at that point.  But it's --

6    Typically they're -- they're very soft and rounded.

7         Q.   What was the next step in the process that

8    you recall with respect to this project, dealing

9    with simulated tile walls made using a CNC machine?

10        MR. HALVERSON:  Objection.  Form.

11        A.   I -- I believe some time went by with --

12   where nothing happened.  And then I took it upon

13   myself to do some research and kind of followed up

14   with Mark again.

15        Q.   Do you recall when you followed up with

16   him?

17        A.   That was I believe November of 2014.

18        Q.   What was the research that you did?

19        A.   Online research trying to find a -- a bit

20   that would produce the right radius to try to remove

21   the sharp edge.

22        Q.   And at that time were such bits for CNC

23   machines well known?

24        A.   Pretty well known, yeah.  You know,

25   there's catalogues of these things out there.

1          Q.   And when you followed up with Mark in

2     November 20?15 what happened at that time?

3          A.   I think that triggered him to do some more

4     testing and he had taken my advice and sourced some

5     -- a rounder bit, something with more of a radius on

6     it.  I don't believe he had tried it at that point

7     in time.

8          Q.   When you followed up with him was that by

9     email or phone?

10         A.   That was by email.

11         Q.   Do you know when Mark ordered that rounded

12    bit?

13         A.   I -- I certainly don't know a date.

14    Sometime between the -- the in-person meeting where

15    I suggested that and -- and the November email.  I

16    would assume it was closer to November because parts

17    like that are, you know, a week or two to -- when

18    you or- -- or even when you order something special

19    they don't take that long.  They're not -- They're

20    not custom made, they're just a supply chain issue.

21         Q.   What was the next step in the process

22    after you followed up with Mark in November 2015?

23         A.   Hmm.  I don't recall the next sort of

24    communication I had with Mark on that.  Luxury Bath

25    Systems was in some -- some business crisis stuff so

1    I think Mark kind of -- wasn't -- wasn't dealing

2    with a lot of research and development stuff for a

3    while.

4         Q.   Do you recall when you next heard from

5    Mark regarding this project after the November 20?15

6    meeting?

7         MR. HALVERSON:  Objection.  Form.

8         A.   I don't recall.

9         Q.   Regardless of timing, do you recall what

10   the next step was in the project?

11        A.   I don't recall specifically.  I -- I guess

12   I would say that the -- the next set of trials with

13   the shallow depth and the bit.  I -- I believe the

14   next step, or close to the next step anyway, would

15   have been success and we both took the product to

16   market.

17        Q.   Do you recall when, or -- Mark brought

18   samples with him during his visit to -- to

19   Belleville.  Did he subsequently send you additional

20   samples?

21        A.   I would have had some samples at some

22   point there.  I don't recall what the timing of that

23   would be, if that was into 2015.

24        Q.   Do you recall how many times Mark showed

25   you samples of his simulated tile walls?

1          A.    At least three times.

2          Q.    What are the three times that you

3     remember?

4          A.    The time in the -- in the winter of

5     2013/'14, and then later in 2014, and then I'm --

6     I'm not sure on the timing but I'm assuming early

7     2015 there was some other samples.

8          Q.    What were the samples you recall in late

9     2014?

10         A.    They were still not -- not a saleable

11    product.

12         Q.    Why not?

13         A.    The sharpness, visual did not -- It looked

14    -- It looked very manufactured, it did not look

15    natural.

16         Q.    Were you -- Now at the time you were

17    talking to Mark were you also talking to Optima

18    about them using a CNC machine to make simulated

19    tile walls?

20         A.    Yes.

21         Q.    Was Mark aware that you were talking to

22    Optima?

23         A.    Yes.

24         Q.    Did Mark care that you were talking to

25    Optima?

1          A.    No.

2          Q.    Did you share any ideas that you may have

3    learned from Optima with Mark and vice versa of --

4    share ideas from Mark with Optima?

5          MR. HALVERSON:  Objection.  Form.

6          A.    Optima wasn't really part of the research

7    and development, they were just the machine

8    operator.  We just -- We just said ?Do this. Run

9    samples?.  We got the samples and evaluated them.

10   So they were not really on the research and

11   development side.  So other than sharing our results

12   of here's what we tried, here's what we got, it

13   wasn't so much -- Yeah, the -- the -- It wasn't

14   Optima learning something, sharing it with me and

15   then Mark.  It was me evaluating the samples based

16   upon a trial parameter that we had set in place with

17   Optima.

18         Q.    Did -- Why did you have Optima make

19   samples in addition to the samples that Mark was

20   already making?

21         A.    Probably just to keep the project moving.

22   Mark's MO is well-known, to -- to not get a lot done

23   so, you know, we had agreed that trying different --

24   different places and different things and different

25   methodologies, you're kind of working on it in

1  parallel and then sharing the samples.  So -- But

2  from my standpoint, just because I didn't trust that

3  Mark would actually see anything through, frankly.

4     Q.   Am -- Am I correct that Optima ended up

5  manufacturing simulated tile sheets using a CNC

6  machine that Milestone ended up sending -- selling

7  commercially?

8     MR. HALVERSON:  Objection.  Form.

9     A.   Yes, they -- they ended up making final

10  product for us, yes.

11     Q.   Does Optima still manufacture those

12  simulated tile sheets for Milestone?

13     A.   No.

14     Q.   When did that stop?

15     A.   2016, 2017.

16     Q.   Why did it stop?

17     A.   They had an equipment breakdown and the

18  cost to repair the particular piece of equipment was

19  extraordinary.  Fifty or $60,000 for some special

20  control pieces that I don't understand what exactly

21  that was.  And they apologized and said that the

22  volume was just not high enough.  You know, even

23  today we don't sell a lot of this type of project,

24  but the volume was too low for them to justify the

25  expense, and we moved the project to a -- a Toronto-

1  based company and then had some -- had some issues

2  with that company.  We ended up -- By then we -- we

3  were stable enough, we knew the prod- -- the product

4  would sell.  We bought our own machine at that point

5  in time.

6       Q.   Did Milestone Bath Products ever buy

7  simulated tile sheets from -- excuse me -- Luxury

8  Bath?

9       A.   Early on we may have bought some.  It'd be

10  very few, but we may have bought some.

11       Q.   And that was the extent of its purchases,

12  that -- that limited amount at the beginning?

13       A.   Yeah, if anything.  I just said we may

14  have but I don't -- I don't recall specifically, but

15  we may have.

16       Q.   How did the --

17       A.   I don't -- Actually, I'm going to correct

18  myself.  I don't -- I don't know if that's correct,

19  because my understanding is that Milestone took the

20  -- took that product to market before Luxury did, so

21  that may not -- that may not be correct.  So, sorry

22  about that, but --

23       Q.   Do you know when Milestone took its

24  product to market?

25       A.   I know there's a document from the Wayback

1　　machine, showing it posted on our -- on our public

2　　website.  It would have been before that.  We're not

3　　really website-technical people on staff -- At least

4　　at that point we weren't.  We are now.  So it could

5　　have been sometime later that we actually posted it

6　　on our public website.

7　　　　　Q.   Do you --

8　　　　　A.   But I would -- I would think it was --

9　　Sorry, can I see that one email document?  It's got

10　　a date on it that might -- the one with the router

11　　bit on it.  That -- Was that November 2014?

12　　　　　Q.   We can -- We'll get to that a little bit

13　　later.

14　　　　　A.   Okay, so you don't want me to answer the

15　　question then?

16　　　　　Q.   I can -- You can answer to the best of

17　　your ability now.

18　　　　　A.   I just need the document to refresh my

19　　memory on the -- on the date, that's all.

20　　　　　Q.   Okay.  Do you recall when Milestone would

21　　have posted its products to its website?

22　　　　　A.   I would refer to the document on that,

23　　from the Wayback machine.

24　　　　　Q.   How did the project as it relates to your

25　　working relationship with Mark end?  You know, is

1    there a point in time where you stopped talking

2    about making simulated acrylic tile walls using a

3    CNC machine?

4        MR. HALVERSON:  Objection.  Form.  Compound

5    question.

6        A.   Sorry, can you repeat the question?

7        Q.   Sure.  Maybe I can ask a better question.

8    When was the last discussion you had with Mark

9    Domanico concerning the use of a CNC machine to make

10   simulated tile acrylic walls?

11       A.   Ignoring the -- the 2023 conversations?

12       Q.   Yes.

13       A.   I don't recall.

14       Q.   Was there a point in time where Mark sent

15   you samples that were acceptable to you?

16       A.   I don't recall if it was Mark's samples or

17   my samples that were first deemed acceptable.  I

18   don't recall that.

19       Q.   Do you recall ever telling Mark that

20   Milestone would not be moving forward with Luxury

21   Bath for those products?

22       MR. HALVERSON:  Objection.  Form.

23       A.   I don't believe there was a conversation

24   regarding that specifically but the -- Mark already

25   knew that we would produce that in Canada.

1    Q.   When did you first become aware of the 243

2    patent, which we marked as Exhibit 1?

3    A.   When I received the initial Cease and

4    Desist letter from BCI.  I had no idea until then.

5    Q.   You don't recall Mark ever mentioning the

6    243 patent to you prior to that letter, is that

7    correct?

8    A.   He had never mentioned it to me.

9    Q.   Do you have any notes or lab notebooks or

10   drawings that relate to your work on creating

11   simulated tile sheets using a CNC machine?

12   MR. HALVERSON:  Objection.  Form.  Asked and

13   answered.

14   A.   I don't believe so.

15   Q.   Do you know what the depth of a real grout

16   line typically is?

17   MR. HALVERSON:  Objection.  Form.  Asked and

18   answered.

19   Q.   He -- He objected.  You can still answer

20   the question.

21   A.   Oh okay, I'm sorry.  I was --

22   Q.   Sorry, I didn't realize you were --

23   A.   I wasn't -- No, I was -- I thought I

24   wasn't supposed to answer.  So the question was do I

25   have any idea what the depth of a real tile, natural

1    tile, porcelain tile, whatever, grout line is?

2         Q.   Correct.

3         A.   It varies.  It's a cust- -- It's a -- It's

4    a craftsman thing that the tile setter would decide

5    depending on the tile, and his tool that he used,

6    and how he prefers to finish it.

7         Q.   Do you know what the range is?

8         A.   I do not.

9         Q.   Were router bits for forming rounded edges

10   well known in 2014?

11        MR. HALVERSON:  Same objection.

12        A.   Rounded router bits were definitely

13   available in that time range.

14        Q.   Mr. Whitley, I'm going to hand you what

15   we've marked as Exhibit 3, which is a document

16   titled Declaration of Jeffrey Whitley.

17        (Whereupon J. Whitley Exhibit No. 3 was marked)

18             Do you recall seeing this document before?

19        A.   Yes.

20        Q.   And if we go to page four of the document

21   there's a signature.  Is that your signature?

22        A.   Yes.

23        Q.   Did you prepare this document?

24        A.   Substantially, yes.

25        Q.   What do you mean by substantially?

1        A.    I reviewed it with my counsel.

2        Q.    Did you prepare it?

3        A.    Yes.

4        Q.    When did you prepare it?

5        A.    September/October 20?23, in that range.

6        Q.    Do you recall how long you -- how much

7    time you spent preparing this Declaration?

8        A.    I type fast, so I don't know, a couple of

9    -- probably the first draft, an hour.

10        Q.    And were there multiple drafts?

11        A.    Yes.

12        Q.    Before you signed this Declaration did you

13    read it carefully?

14        A.    Yes.

15        Q.    And is everything in this Declaration 100

16    percent correct and accurate?

17        A.    Yes.

18        Q.    In Paragraph 2 you indicate that you began

19    working with a company called Luxury Bath as the

20    exclusive Canadian distributor for certain products

21    that Luxury Bath was making.  Do you recall what

22    those projects were?

23        A.    Yeah, I believe I answered previously.

24    But it is, you know, bathtubs, shower pans, the bath

25    and shower wall systems, the acrylic systems and the

1    accessories to go with that.

2         Q.   In Paragraph 3 you say that both you and

3    Milestone engaged Optima.  What did you mean by

4    Milestone and yourself?

5         A.   Well --

6         Q.   What I'm trying to get at, was the

7    relationship with you or was it with Milestone?

8         A.   It was --

9         MR. HALVERSON:  Objection.  Form.

10        A.   It was ? Well, both, in a way.  I had --

11   You know, I was the CEO at the time, of the

12   corporation.

13        Q.   You did not engage Optima in your personal

14   capacity, did you?

15        A.   No.

16        Q.   In Paragraph 3 you refer to an agreement

17   with Optima that you attached as Exhibit 1 to your

18   Declaration.

19        A.   M'hm.

20        Q.   Which is a document titled Non-

21   Disclosure/Non-Compete Agreement.  Do you recall any

22   other agreements between Optima and Milestone Bath

23   Products Inc., other than this Non-Disclosure/Non-

24   Compete Agreement?

25        A.   No.

1      Q.   In Paragraph 4 you state that ?During this

2   collaboration with Optima I began developing a

3   process for creating acrylic shower walls?.  Do you

4   see that there?

5      A.   Yes.

6      Q.   What is the process you began developing

7   at that time?

8      A.   Well, we had sent them -- we had sent them

9   acrylic sheets, they did up a -- a quick program,

10   and we did our trials to groove the grout line

11   patterns.

12      Q.   And was -- was this the process that Mr.

13   Domanico had described for you?

14      A.   Yes, this is the -- the same project that

15   Mark and I were working on to try to create this

16   different tile pattern.

17      Q.   And -- And what did you contribute to

18   developing a process for creating acrylic shower

19   walls?

20      A.   Can you clarify -- excuse me -- Can you

21   clarify the question?  You just said acrylic shower

22   walls.  All -- All acrylic shower walls or --

23      Q.   No.

24      A.   -- these particular shower walls?

25      Q.   These -- The -- The shower walls that are

1    the subject of your Paragraph 4.

2         A.   Well, I provided the bit and the depth,

3    the patterns, like the -- the actual style and

4    design.

5         Q.   Anything else?

6         A.   That's -- that's what I can recall.  That

7    were the main components anyway.

8         Q.   And in the very last sentence of Paragraph

9    4 you state that ?The process provided Milestone's

10   customers a cost-effective shower wall?.  But why is

11   it that that process resulted in a cost-effective

12   wall?

13        A.   Just that it took a regular -- It -- It

14   was a -- in line with the pricing model for other

15   products.  There's -- You know, it was saleable, it

16   wasn't triple the price or -- it was in the same

17   price range as all the other products that we sold.

18        Q.   In the first sentence when you say you

19   began developing this process, what do you mean that

20   you began at that time?

21        A.   Well, the process up 'til this point

22   wasn't -- wasn't saleable.  It was -- you know, it

23   was -- and we talked about it, it was too rough

24   around the edges, so I began my own work to develop

25   the finished product at this point.

1      Q.   When did that begin?

2      A.   Sometime in 2014.  I can't recall an exact

3   -- exact time.

4      Q.   Was there a point of contact at Optima who

5   you worked with?

6      A.   Primarily the original owner.

7      Q.   What was his name?

8      A.   Gilles Chartrand, a French name.

9      Q.   Any other people at Optima that you worked

10   with on this project?

11      A.   He was the primary as the owner, and that

12   -- that's who I recall.  At least the vast majority

13   of the conversations all went through him, and then

14   he would have communicated down to his team.

15      Q.   Also in Paragraph 4 you refer to a -- a

16   realistic-looking simulated tile pattern.  What --

17   What did you mean by that?

18      A.   Realistic means it looks similar to tile

19   that -- that a tile setter would set.  It means the

20   fit and finish of the grout line.  It doesn't look

21   mechanical, or it looked -- you know, looks

22   relatively natural.  So perhaps a layperson would

23   look at it and -- and believe it's -- it's real

24   tile.

25      Q.   In Paragraph 5 you state that you

1    regularly collaborated with Mr. Domanico on

2    technical advances in the bathtub tile space.  What

3    -- What do you mean by regularly collaborated?

4         A.   Just when they would have technical

5    issues.  Sometimes I would bring the technical --

6    the problem to them and often they were a little

7    lost on how to -- how to correct it or how to fix

8    it.  So I regularly collaborated with different

9    ideas.

10             They had -- We talked about, you know,

11   there's this product, the patent issue one.  We

12   talked about the printing, on sheets.  There was

13   another one where they had a bright idea to pour

14   structural foam in between -- I'm not sure if you

15   know what a tub liner is.  That's where a -- a shell

16   goes on top of an old worn out tub.  And they had a,

17   you know, idea to -- to pour a structural foam down,

18   but it was a disaster.  It caused a lot of failures,

19   things like that.

20             So, often I would talk with Mark of like

21   the -- the problem, here are some things to try to

22   solve that; this is what's not working, this is why

23   I think they're failing, those kind of things.  And

24   the end result of that was they pulled it off the

25   market.  But, you know, those -- those type of

1    things.

2           I also spoke with Mark, but more the CEO,

3    but certainly Mark I spoke with as well about my

4    technology, my walk-in bathtub that I was trying to

5    get -- you know, them to purchase them.  I was -- I

6    was to market on that product, so I was hoping they

7    would buy that product from me.  Mark was amazed at

8    the technology of that tub and how that happened, so

9    we would talk about those kind of things as well.

10          I developed some very sophisticated

11   software, best in the industry, and had lots of

12   conversations about what that would do if they

13   implemented that software into their business.  They

14   had a lot of problems and ending in the -- the

15   business being dissolved in the end.  So they had a

16   lot of challenges that often I was helping him with

17   those things.

18          There was a period of time I ran an

19   advisory committee with their top customers to try

20   to work through some of the problems that the

21   business had and get -- get suggestions from their

22   top 10 people, and I facilitated those events.  I'd

23   fly into Chicago and do those kind of things.  There

24   was a period of time where I was in Chicago very

25   often.

1          Q.   How many of those advisory committee

2     meetings were there?

3          A.   I don't recall, it's been too many years.

4     I'm sorry.  Multiple for sure, but I don't recall

5     how many.

6          Q.   Why -- Why did you do this; what did you

7     get out of it?

8          MR. HALVERSON:  Objection.  Form.

9          A.   Some of -- Some of it was just I like to

10    help people.  Some of it was just that I saw the

11    same problems as their -- their other top 10

12    customers.  I -- You know, it was in my interest to

13    see them be better -- be a better company, succeed.

14    I didn't really get anything out of it of any

15    significance anyway.  They may have sold me

16    something or, you know, given me some free product,

17    or something like that.  But nothing of any large

18    significance.  But part of it was using my -- my

19    continuous improvement Kaizen background that I

20    hadn't used in -- in some years.  So that was kind

21    of fun for me.  I really -- I really loved that type

22    of work.  But -- Yeah, so I didn't get -- I didn't

23    get a lot out of it, other than a hotel room near

24    the airport and some take-out.  But they were always

25    a lot of fun.  The CEO that they ended up

U.S. Legal Support | www.uslegalsupport.com

```
 1      terminating for -- for fraud and some other things,
 2      was a lot of fun, we'll just say.  So I had a lot of
 3      fun in Chicago, and it was always a good time to go
 4      there and do a little trip away.  They treated me --
 5      They treated me very well and, you know, some of --
 6      you know, that was -- that was work stuff, but
 7      sometimes they would just have more social get-
 8      togethers with some of their top people.  I was
 9      always invited to those.  So they -- they treated
10      really well, you know.  So that's -- I -- I was
11      always willing to help them out because I always
12      found it helped me.  If there was a problem with a
13      product they were making, if I helped them solve it,
14      when I -- you know, that solved the problem for me,
15      and me reselling it to my customers.  So it was --
16      it was a very -- In those years, in the -- it was a
17      very positive working relationship.  So I was
18      willing to help them, and they were willing to help
19      me, and we just kind of had this little different
20      relationship beyond -- I think beyond a typical just
21      distributor.  We were -- We were a little more
22      ingrained than that.
23              Q.   The software that you mentioned, what did
24      that software do?
25              A.   It's complete franchise level business
```

1  software.  So everything from call centre and

2  marketing operations, full CRM.  The main piece that

3  makes it different is there?s a whole in-home sales

4  component with quoting system that the customers --

5  the actual renovators who -- who install the

6  product, their sales people, can go into a

7  customer's home, sell the product.  When they sell

8  it, the material order's already created

9  automatically for them.  Really tons of mistake-

10  proofing built in.  Job scheduling for their

11  installers; follow-ups if there's warranty call-

12  backs; it handles all those kind of things.  So

13  basically, it's a -- it's a start-to-finish business

14  system.  That's the -- the main reason I was able to

15  franchise the bathroom modelling business.

16         And at that point in time we were only in

17  Canada, so there was some discussions about what we

18  could do with them in the U.S. as well.  So not a

19  technical discussion, but more of a business

20  discussion.  They were struggling so badly through

21  that, you know, 2014, 2015 period.  No, it ended

22  their business, I guess is the ultimate evidence.

23  But they were losing customers and they were -- they

24  were struggling a lot.  So we had some discussions

25  on, you know, could my company come in and, you

1    know, leave them just manufacturing and not let them

2    talk with their customers any more, kind of thing.

3    We would handle that.

4           So there was some -- lots of high level

5    business discussions that happened as well.

6           Q.   This franchising software that you

7    mentioned, did you offer to sell that to Luxury

8    Bath?

9           A.   I don't know if I offered to sell it to

10   them.  We talked about the use of it so I'm not sure

11   what that discussion -- if it was licensing or that

12   we would just make a royalty off the customer.  So

13   they would never -- they would never own or use the

14   software, we -- we would just set their customers up

15   in our software, so I -- I don't recall.  Maybe it

16   was thrown out different ways.  Mark was very

17   excited about that, but they -- they never made a

18   decision, so --

19          Q.   And the expectation was that you weren't

20   going to just give this to them --

21          A.   No.

22          Q.   -- you would be compensated --

23          A.   Not --

24          Q.   -- in some form?

25          A.   No, I spent $2,000,000 on that software;

1     that's a little different game.

2         Q.   In -- So going back to your Declaration

3     here, Exhibit 3.  In Paragraph 5, in the second

4     sentence you refer ?In the 2014s? -- What did you

5     mean by the 2014s?

6         A.   Well, that's in line with the simulated

7     tile project.  You know, that sort of '13/'14 period

8     is where this was all -- all happening.  And then

9     2015 the project was over, and it was to market.  So

10    I -- I just can't recall the -- As you -- As I've

11    already -- As I've already testified, I can't recall

12    the exact date other than sort of winter 2013 and

13    '14, when we began.

14        Q.   In Paragraph 7 of your Declaration, you

15    state ?Mr. Domanico and I developed a method of

16    carving a tile pattern into a sheet of acrylic

17    plastic?.  Do you see that there?

18        A.   Yes.

19        Q.   What is the method you're referring to

20    there?

21        A.   The CNC method.

22        Q.   And what was your contribution to that

23    method?

24        A.   My contribution was the bit to make the --

25    to make the tile pattern visually and physically

1    acceptable through the -- the bit and the depth of

2    the bit, and really getting it to a finished goods

3    product.

4         Q.   Any other contribution?

5         A.   That's the big ones anyway.  We may have

6    had some discussions, we probably did have some

7    discussions, you know, on -- on what would -- what

8    -- what size of tiles and, you know, those kind of

9    things.  But that's not really -- really pertinent

10   to this discussion.

11        Q.   Continuing in Paragraph 7 on to page

12   three, on the second half of Paragraph 7, you say

13   ?Specifically, Mr. Domanico and I met to discuss Mr.

14   Domanico's idea?.  Do you see that there?

15        A.   M'hm.

16        Q.   When was that meeting?

17        A.   That was the winter 2013/2014.

18        Q.   Do you have any documents or emails or any

19   other evidence to corroborate what was discussed at

20   that meeting?

21        A.   Unfortunately no.  When I sold the

22   franchising entity in 2013 a -- a multi-step thing

23   happened.  We went from a traditional physical

24   server at our location, you know, Microsoft physical

25   server, then we went to Google Drive email, to

1    what's now called Office 365.  And I sold the

2    business that was the franchising entity and they

3    ended up with that -- that domain that was all my

4    email, they ended up with my email address.  And as

5    I previously testified, there was a -- a Court

6    lawsu- -- there was a lawsuit, and I do not have

7    access to any of those old emails in that time

8    period unfortunately.

9        Q.   Is it -- Do you recall what that time is

10   that -- it's kind of cut off from when -- when you

11   have access to emails and when you don't?

12       A.   Not -- Not an exact month.  I did have

13   access -- I'm going to say it was summer or fall of

14   -- late summer or fall of 2013.  That's when

15   everything collapsed and the lawsuit commenced.

16       Q.   In your various discussions with Mr.

17   Domanico on the projects that you've referred to,

18   was there ever any discussion about who would have

19   the rights to any of the ideas that you two worked

20   together on?

21       A.   No.  No discussion on rights.  Had there

22   been, I would have honored that.

23       Q.   Mr. Whitley, I'm handing you a document

24   that we've marked as Exhibit 4, and it has

25   production numbers in the lower righthand corner:

1    MBP-000005.

2        (Whereupon J. Whitley Exhibit 4 was marked)

3        This is an -- an email thread.  Do you recall

4    having seen this email thread before?

5        A.   I -- I believe it's an accurate email that

6    went -- went back and forth in 2015.  I'm not sure if

7    that's -- Is that the 10th of July 2015 or the --

8        Q.   You don't -- It -- It --

9        A.   -- or October 7th?  I don't know how the --

10       Q.   So if you look at the lower --

11       A.   Oh, okay.

12       Q.   -- emails on the thread --

13       A.   There we go, thank you.

14       Q.   -- it -- it spells out October.

15       A.   I see that, thank you.

16       Q.   So this email relates to communications --

17       A.   M'hm.

18       Q.   -- that you were having with Optima --

19       A.   M'hm.

20       Q.   -- and specifically -- I'm going to -- I

21   don't speak French, Gilles Chartrand.

22       A.   M'hm.

23       Q.   And he was your contact at Optima, is that

24   correct?

25       A.   Correct.

1        Q.   Okay.  In the very top email --

2        A.   M'hm.

3        Q.   -- you refer to ?colored ones are for

4    photos only, not grooving?.

5        A.   M'hm.

6        Q.   What were you referring to there?

7        A.   I think this is unrelated.  The -- The

8    colored ones -- So we were in production on

9    grooving, and I think I probably sent something and

10   he scanned it for me.  Like an unrelated project.

11   New -- We had like a new color, a new pattern.

12   Like, you know, something looks like this, and he

13   probably ran it through his scanner for me.  I don't

14   think it's related to this project.

15       Q.   And -- And just to clarify.  This email

16   thread we marked as Exhibit 4, does not relate to

17   the use of a CNC machine to make a simulated tile

18   acrylic sheet?

19       A.   I -- I think it relates to -- that we sent

20   extra sheets along with the ones for grooving.  But

21   the -- the line about the colored ones, that's -- he

22   was taking some -- some high resolution images for

23   me for a -- probably for our website or something

24   unrelated.

25       Q.   Okay.  How --

1          A.   But he was already grooving by then

2     because that's why it specifies not grooving.

3     That's what I believe this means.

4          Q.   Okay, let me back up.  Is -- Does the

5     grooving relate to simulated grout lines?

6          A.   Yes.

7          Q.   And does this email thread relate to the

8     use of a CNC machine to make simulated grout lines?

9          A.   Yes.  That portion, yes.

10          Q.   And did you, in the course of looking for

11     documents for this case, did you look for all of the

12     correspondence that you had with Optima concerning

13     the use of a CNC machine to make simulated grout

14     lines?

15          A.   I did.

16          Q.   Okay.  And you produced anything that you

17     found?

18          A.   Correct.

19          Q.   Do you recall if you found any

20     correspondence with Optima relating to the use of a

21     CNC machine to make simulated grout lines prior to

22     October of 20?15?

23          A.   I can't recall that.

24          Q.   Mr. Whitley, I'm going to hand you a

25     document that we've marked as Exhibit 5, and this is

1        an email thread that bears production number

2        MBP-000003.

3                (Whereupon J. Whitley Exhibit No. 5 was marked)

4                        Is this an email that you recall seeing

5        before?

6            A.   Yes.

7            Q.   Let's start at the bottom of this page and

8        work our -- our way up.  So -- Which is the first

9        email chronologically in the thread down at the

10       bottom.  The very last line you say ?Hi Gil.  How

11       are things going on the project??  Do you know what

12       project you're referring to there?

13           A.   This was -- It looks like it was printing

14       the marble patterns, printing the marble patterns on

15       the -- on the sheets, with him doing some laminating

16       trials.

17           Q.   And then if we -- As we move up the page,

18       on October 21st, 20?15, at 11 -- at 8:57 in that

19       email you refer to grooving.  What is the grooving

20       that you are referring to there?

21           A.   That would be the -- the CNC cutting of a

22       production -- production order.

23           Q.   And if we go to the very top email, where

24       you're referring to the 38-inch wide and 60-inch

25       wide subways, do you see that there?

1          A.    Correct.

2          Q.    Does that refer to simulated tile sheets

3     made with a CNC machine?

4          A.    Yes, the subway part of it, yes.

5          Q.    Okay.  And when you're referring to --

6     that they're ready to pick up, do you know if those

7     were just samples or were those production sheets?

8          A.    This would have been production sheets.

9          Q.    And then in the last line of this email

10     you refer to a photoshoot.

11          A.    M'hm.

12          Q.    Do you know what that photoshoot was?

13          A.    Well, I think that verifies these extra

14     sheets that we had sent to -- to be photographed.

15     Un- -- Unrelated to the grooving project.  That was

16     relating to the -- the project of printing the --

17     the tile -- or printing the marble patterns or

18     whatever we wanted on the sheets.  That -- That

19     project at that point in time never really went

20     anywhere, unfortunately.

21          MR. HALVERSON:  If we're going to do another

22          one, is this a good time for a break?

23          MR. REMUS:  Yeah, no, that's fine.  We can go

24          off the record.

25          MR. JEWELL:  Going off the video record at

1          16:29 UTC.

2                    (OFF THE RECORD)

3          MR. JEWELL:  Back on the video record.  The

4          time is now 16:39 UTC.

5     BY MR. REMUS:

6          Q.   Mr. Whitley, I'm handing you a document

7     that we've marked as Exhibit 6, and it bears

8     production numbers MBP-000006 through 09.

9          (Whereupon J. Whitley Exhibit No. 6 was marked)

10              This is a -- an email from Jeff Kinkaid

11    dated June 26, 2015.  Do you recall having seen this

12    email before?

13         A.   Yes.

14         Q.   Who is Jeff Kinkaid?

15         A.   Jeff Kinkaid worked for Luxury.  He was

16    sort of their -- their technical guy.

17         Q.   What do you mean by technical guy?

18         A.   He did installer training for, you know,

19    the U.S., their customers.  If you had a technical

20    issue -- You know, if one of their customers had a

21    technical issue they would typically be routed

22    through to Jeff Kinkaid for ?how do I do this?,

23    those kind of things.  So a pretty technical --

24    technical person on the team.  He was not in the --

25    No, he wasn't part of the sales team, or customer

1    service, he was the -- the -- the technical guy.  I

2    -- I think pretty much the only technical guy they

3    had sort of on staff to support their -- to support

4    their customers.

5         Q.   In this email there's some attachments

6    that are attached --

7         A.   M'hm.

8         Q.   -- to the exhibit, which are various files

9    showing tile patterns.  Do you know why Mr. Kinkaid

10   was emailing these patterns to you?

11        A.   I believe it was the result of Mark and I

12   brainstorming of some typical patterns that would be

13   saleable.  You know, ones that -- Because with the

14   CNC you can do any -- anything, any pattern, any

15   shape.  But Mark and I had had some discussions on,

16   you know, what -- what do we think we want to start

17   with and develop.  And then he's -- he's had Mark do

18   the programing and come up with ? or, sorry, not

19   Mark, Jeff.  He's had Jeff do the programing and

20   send these to me for my review.

21        Q.   Did you send anybody at Luxury Bath any

22   patterns of your own?

23        A.   I think we -- So these -- These are like

24   secondary-step ones; these were not the ones we

25   started with.  The ones we started with were like

1    typical three by six subway, like you would see in

2    an older home, those kind of things.  So that's

3    where we started.  The same as -- You know, Mark and

4    I both started with those ones.  This is like a -- a

5    second step later in the process where he's ?Okay,

6    what else can we make??  And we had had a discussion

7    on what we thought we would sell, so he was sending

8    these to me based upon that conversation, is how I

9    recall.  Some modern ones, some traditional ones.

10           Q.   And do -- do you recall sending any

11   patterns to Luxury Bath?

12           A.   No, I don't have the -- the software to do

13   that, so I -- I don't believe I sent anything like

14   this.  It was just a verbal discussion.

15           Q.   Mr. Whitley, I'm handing you what we've

16   marked -- Wait.

17               Actually, what was that last exhibit?

18           MADAM REPORTER:  Six.

19           MR. REMUS:  Sorry, I'm off one.

20           MADAM REPORTER:  We're on seven.

21           MR. REMUS:  We are on seven?

22           MADAM REPORTER:  M'hm.

23   BY MR. REMUS:

24           Q.   I'm handing you what we've marked as

25   Exhibit 7, which is an email thread bearing

1      production numbers MBP-000026 through 27.

2            (Whereupon J. Whitley Exhibit No. 7 was marked)

3                  Do you recall seeing this email thread

4      before?

5            A.   Yes.

6            Q.   I want you to look at the second email

7      thread, second from the top.  The one from Mary

8      Riordan --

9            A.   M'hm.

10           Q.   -- to you.  Do you see that there?

11           A.   I do.

12           Q.   Do you know who Mary Riordan is?

13           A.   Yes, I do.

14           Q.   Who is she?

15           A.   Mary was with Luxury for a very short time

16     immediately after Michael Krawitz was terminated.

17     Mark Domanico stepped in as CEO for a short time.  I

18     don't think that went very well for the company and

19     then Mary had stepped in to run the day-to-day

20     operations.  I do not know -- I was not party to her

21     hiring, or who hired her, or anything else like

22     that.  But I do -- I do recall that things had not

23     gone very well with Mark stepping back to run the

24     day-to-day operations of the company.  That's not

25     really his forté.

1          Q.   Okay.  So in this email Mary was asking

2     about finding time to chat, and then in response you

3     propose some -- some times.  Do you recall whether

4     or not that phone call actually happened?

5          A.   I believe it did.  I had many

6     conversations with Mary, yeah.

7          Q.   Do you recall what was discussed on that

8     phone call?

9          A.   Most -- With Mary they were not typically,

10    you know, heavy technical discussions; most of it

11    was really into software, helping them out of their

12    -- their business trouble, financial and -- and

13    business trouble.  Mary loved my software.  She was

14    a big supporter of the -- you know, trying to work

15    together, and I'm not sure if she had enough clout

16    at that point in time to make it happen

17    singlehandedly with the other shareholders, but it

18    certainly -- that's the type of thing -- She was

19    very interested.  She couldn't believe -- She was

20    new to the company, she's not from the bath

21    industry.  So I don't know if you -- don't know

22    where she came from, but she was a very sharp

23    cookie, even for a lawyer.  She was a lawyer.

24         Q.   It's a low bar.  In -- In Mary's email she

25    refers to a few concepts --

1          A.    M'hm.

2          Q.    -- that she wanted to run by you.  Do you

3     recall what those concepts were?

4          A.    I believe they were business concepts, not

5     -- not CNC grooving or technical concepts.  They

6     were concepts of us -- us helping them with our

7     business systems more so than anything product-

8     wise.

9          Q.    Mr. Whitley, I'm handing you a document

10    we've marked as Exhibit 8, and it bears production

11    numbers MBP-000048 through 53.

12         (Whereupon J. Whitley Exhibit No. 8 was marked)

13            This is again a -- another email thread

14    that has been produced to us.  Is this an email

15    thread you recall seeing previously?

16         A.    Yes.

17         Q.    Do you recall generally what the subject

18    of this email thread was?

19         MR. HALVERSON:  Objection.  Form.

20         A.    This was deep into the time period where

21    Luxury Bath was struggling financially business-

22    wise.  Mark had stepped back in.  You can see his

23    title is CEO; it was not CEO previously.  So this

24    was during that time period where they were

25    struggling; he was trying to change our payment

1    terms because they had cashflow issues.

2         Q.   Was there ever any -- any discussion about

3    Milestone acquiring Luxury Bath?

4         A.   No.

5         Q.   On the very first page of Exhibit 8 in the

6    third bullet-point in Mark's email to you he refers

7    to litigation or a lawsuit between Bath Solutions

8    and you.  What is that litigation?

9         A.   That's the franchising entity that I sold.

10        Q.   Okay.  And what -- Who is Five Star?

11        A.   That's the company that bought the

12   franchising entity from me.

13        Q.   Okay.  And so the litigation was between

14   Milestone and Five Star over Bath Solutions?

15        A.   Correct.  Well, it was -- The business was

16   still -- was Bath Solutions Inc., was my business I

17   still owned, and I sold Bath Solutions Dealership

18   Corp. Inc., which owned the trademark Just Bath

19   Solutions for doing bathroom renovations.

20        Q.   Mark comments that he did not want to get

21   involved in the lawsuit between Bath Solutions and

22   you, and ?I don't want to get involved in another

23   lawsuit?.  Do you know what the concerns there with

24   Mark getting involved in that lawsuit between you

25   and Bath Solutions?

1          A.   I do.  The -- The Five Star people

2     basically went to Mark and said we have the rights

3     to buy the product, which was not correct.  Bath

4     Solutions Dealership Corp. Inc. never had the rights

5     to be the Canadian distributor.  In fact their

6     company didn't sell product; all they did was

7     collect royalties.  So not -- The principal in

8     particular at Five Star, in a pretty low way, went

9     to Mark, and then I explained to Mark.  I offered to

10    show him the documents, I offered to show him who

11    owned the -- who owned the corporation still of that

12    day, and his answer back is ?Oh, I just don?t want

13    to get involved?.  Well, he was trying to -- he was

14    trying to play both sides, which this is a --

15    perhaps the beginning of the end of my relationship

16    with Mark for many years.  It led to some other

17    things as well where they were breaching their

18    agreement and cheating on us, and then lied about

19    it.  So that's the -- perhaps some of the start of

20    that in this email.

21         Q.   Okay.  How did the lawsuit involving Bath

22    Solutions and Five Star end?

23         A.   It settled.  One of us got a cheque.  The

24    guy with the smile.  It was a failure to pay, was

25    the main --

1        Q.    I'm handing you a document that we've

2    marked as Exhibit 9.  It bears production number

3    MBP-000040.

4            (Whereupon J. Whitley Exhibit No. 9 was marked)

5            And this is an email from Mark Domanico to

6    Scott Rosenbach, copying you, dated August 25th,

7    20?15.  Do you recall seeing this email briefly --

8        A.    Yes.

9        Q.    -- before?  Do you know why Mark was

10   introducing you to Scott Rosenbach?

11       A.    Yes.  Luxury Bath was no longer at that

12   point in time, they had gone out of business.  Mark

13   sold the assets of Luxury Bath to BCI, a competitor.

14   And so I was looking -- Mark was introducing me to

15   BCI to see if we could put something together to be

16   their Canadian distributor or buy and redistribute

17   product of some sort.  So this culminated in -- in a

18   visit to BCI in Chicago.

19       Q.    Do you recall when that visit was?

20       A.    Not offhand.  I think there's another

21   email teeing up the -- the details that might be in

22   the package there, but I don't remember.  It would

23   be after this sometime, probably early fall. But I

24   -- I don't know offhand the details.

25       Q.    Did Milestone end up buying product from

U.S. Legal Support  www.uslegalsupport.com

```
 1        BCI?

 2             A.   Perhaps a small amount for a short period

 3        of time, but because the Luxury Bath colors and

 4        patterns and everything went over to BCI, so we may

 5        have filled some orders and -- and done some things

 6        short term but not longer term.

 7             Q.   The last line, or the last paragraph of

 8        this email says ?Jeff would like you to call him

 9        ASAP to introduce himself?.  Do you recall if Scott

10        called you?

11             A.   We spoke on the phone.

12             Q.   What was discussed?

13             A.   Just a brief introduction and the invite

14        to -- to visit and see if we could come up with --

15        come up with a distribution plan.

16             Q.   I'm going to hand you what we've marked as

17        Exhibit 10, which is a document bearing production

18        numbers MBP-000038 through 39.

19             (Whereupon J. Whitley Exhibit 10 was marked)

20                  This is an email from Mark Domanico to

21        you, copying Scott Rosenbach.  Do you recall seeing

22        this email previously?

23             A.   Yes.

24             Q.   Do you recall if you ever wrote back to

25        this email?
```

1    A.   I believe I did.

2    Q.   All right.  Do you recall what that

3  response was?

4    A.   I believe I went there.

5    Q.   Okay.  What was -- When you visited in

6  person what was discussed?

7    A.   I had a facility tour, met some of the

8  people there; we discussed the basics of if I could

9  distribute their product at a -- similar to what I

10  had done with Luxury.  They were not interested in

11  that at all.

12    Q.   Why --

13    A.   We had dinner.

14    Q.   I'm sorry, continue.

15    A.   Did you ask why?

16    Q.   Well yeah, why weren't they interested in

17  that?

18    A.   I don't think I can speak fully for them

19  but basically they -- at that point they said ?We

20  can -- We can distribute into Canada ourselves?.  It

21  was okay by me.  It wasn't a make -- It was not a

22  make-or-break of my business or -- You know, we had

23  our own products we were selling.  You know, it was

24  sort of a small additional offering kind of thing

25  that we were doing at that point.  So I -- I can't

1   speak to why they weren't interested but they were

2   not interested.

3        Q.   Yeah, well, it -- I should have asked a

4   better question, as do you -- did they explain to

5   you why they weren't interested?

6        A.   Only that they could just distribute into

7   Canada directly and they already had been doing that

8   for other customers that weren't mine so that would

9   have perhaps disrupted things, I don't know.  But

10  that's -- that was it.  They just weren't

11  interested.  It was polite, there was no -- no real

12  animosity about it, it was just -- We had a nice

13  dinner afterwards and I flew home.

14       Q.   I'm going to hand you a document that

15  we've marked as Exhibit 11, which bears production

16  number MBP-000060.  This is an email from Davis

17  Glassberg to jeff@bathsolutions.ca.

18       (Whereupon J. Whitley Exhibit 11 was marked)

19            Do you recall seeing this email before?

20       A.   Yes.

21       Q.   Is the email jeff@bathsolutions.ca, is

22  that you?

23       A.   Yes.

24       Q.   In this email -- And if you need to take a

25  minute to review it, certainly take your time.  But

1    it refers to a discussion regarding the business

2    relationship with BSI and expansion plans for the

3    future.  Do you recall what those discussions were

4    with Mr. Glassberg?

5          A.   I do not believe I had discussions with

6    Mr. Glassberg.  I probably met with Mary, probably

7    had a phone discussion with Mary.

8          Q.   Do you know who Mr. Glassberg is?

9          A.   I do.  He's a o- -- a shareholder, or was

10   a shareholder, of the -- the original Luxury Bath,

11   son of one of the more significant shareholders.  He

12   was -- Let?s say his normal job there was a lower

13   tier, he was a sales trainer more so.  I didn't have

14   -- A very nice man.  I named my son Davis after him.

15   Well, I liked the name more so than after him.

16   After -- After a trip to Chicago, as my wife and her

17   best friend were sitting on the couch talking about

18   baby names for my son while he was still in the

19   womb, and that's where Davis came from.

20               Nice man but I didn't do a lot of -- He

21   was always at the events, and he was always there,

22   but I didn't really have any, you know, high level

23   interaction with him, with Davis.  He was always the

24   sales training guy, and he came to a few events in

25   Canada to do training for our group of salespeople

1    here.

2         Q.   Do you know what the expansion plans for

3    the future were, that are referenced in this email?

4         A.   I believe the expansion plan was survival

5    at this point.  They really were in trouble, and the

6    CEO had been fired, left them millions in debt, is

7    my understanding.  And so I -- This was just -- They

8    were looking for ideas to get out of it.  Probably

9    the start of what was a good relationship with Mary.

10        Q.   I'm going to hand you what we've marked as

11   Exhibit 12, and this bears production number

12   MBP-000057, which is an email thread from, I guess

13   there's a number of different dates here, but

14   November/December 2014 timeframe.

15        (Whereupon J. Whitley Exhibit 12 was marked)

16             Do you recognize this email thread?

17        A.   I do.

18        Q.   In the first email in the thread

19   chronologically, the one down at the bottom that you

20   sent on November 9th, 20?14.  What was the status of

21   the discussions between Luxury Bath and Milestone at

22   that time?

23        A.   Again, this is in the period of time where

24   they were in significant trouble and we were

25   discussing that Milestone would take over all the

1      customer service and sales, and sales process, order

2      processing, everything for all of their customers in

3      the U.S.  At that point we were only in Canada.  And

4      that they would just get orders, they wouldn't

5      really be talking with the customers, we would

6      handle all the customer service pieces and -- and

7      order processing for them.

8          Q.   Would --

9          A.   So they would give us their -- in our

10     industry we call it a dealer network but basically,

11     they would hand over their customers to us.

12         Q.   And would they remain responsible for

13     manufacturing?

14         A.   Yes.

15         Q.   Would Milestone have any responsibility

16     for manufacturing?

17         A.    Not in the U.S. necessarily, although we

18     would -- It just never got to that -- that point.

19     But obviously they were looking to be -- looking

20     that we weren't going to be selling them the product

21     we made in Canada, they would -- because that would

22     put them out of business, right?  So this was a way

23     to try to save their business and address some of

24     the problems they had.

25         Q.    The -- In your email to Mary, in the very

1    first bullet-point you suggest exchanging NDAs.  Do

2    you know if that was ever done?

3          A.   It was not done, to my recollection.

4          Q.   Why is it that you proposed exchanging

5    NDAs?

6          A.   So we could share customer lists and

7    information like that, or they could share theirs

8    with me.

9          Q.   Is it your understanding that an NDA is a

10   non-disclosure agreement?

11         A.   Yes.

12         Q.   In the top email from you to Mark

13   Domanico, in the second paragraph you refer to ?your

14   strengths and our strengths?.  What were the

15   strengths of Luxury Bath that you were referring to

16   there?

17         A.   I might have been blowing a little bit of

18   smoke there, but probably that they were

19   manufacturers.  You know, they -- they had the

20   vacuum-forming machines to do that type of work.  I

21   don't know.  At this -- at this period of time we

22   were probably still third party doing some other

23   things.  But they had the -- the big warehouse to

24   deal with some of that, so --

25         Q.   What were your strengths?  ?Your? being

1    Milestone's.

2          A.    Systematic operation of a multimillion-

3    dollar business would be one.  Software would be

4    part of -- part of how we were so systematic.  High

5    customer service, high ability to -- to sell without

6    the -- without too much pain and suffering.  But you

7    know, from a business standpoint.  My personal

8    skills might be a little different than that but

9    nothing that -- That was the business strengths that

10   we would bring to the table.

11         Q.    Can we turn to your Declaration, which we

12   marked as Exhibit 3.  And I want to turn to Exhibit

13   2 to your Declaration, which is an email thread.

14         A.    M'hm.

15         MR. HALVERSON:  Oh sorry, Exhibit 2.

16         Q.    And we'll, as usual, start at the bottom

17   and work our way up.  The bottom email is an email

18   from you dated November 4th to Mary Riordan and Mark

19   Domanico.  Do you see that?

20         A.    I do.

21         Q.    Two people who are cc'd are Tiffany Koll

22   and Laura Dolamore.  Do you know who they are?

23         A.    They were my employees.

24         Q.    What were their positions?

25         A.    Tiffany Koll was a manager.  Laura, she

1    did a few things in the company.  Probably at this

2    time she was doing customer service support stuff.

3         Q.   In your email, in the second paragraph

4    starting with ?I wanted to share a concern that

5    several people here voiced?.  Do you see that there?

6         A.   M'hm.

7         Q.   Do you know who the people were who you're

8    referring to there?

9         A.   The staff primarily, at that point.

10        Q.   Do you know how many people voiced that

11   concern?

12        A.   I don't recall.

13        Q.   And you're -- That paragraph explains

14   ?Everybody here was concerned with the sharp edges

15   at the grout lines?.  Do you see that there?

16        A.   Yes.

17        Q.   And you noted ?Perhaps you have even heard

18   this before?.  Why did you think that perhaps Mark

19   had heard that before?

20        A.   I had had a discussion with him on that

21   issue, and I think he felt the same way.  He -- He

22   wasn't trying to say it was good, he was -- he knew

23   that was a problem.  Just didn't have a solution.

24        Q.   In the -- Staying in that same email, the

25   bottom email, in the second paragraph you say

1    ?Although we really love the concept, everybody here

2    was concerned with the sharp edges?.  What is the

3    concept that you were referring to in that email?

4         A.   The concept of the grooved -- the grooved

5    wall systems.

6         Q.   And then in response to your November 4th

7    email, on November 5th Mark Domanico responds ?We

8    have already ordered a rounded bit for our CNC

9    router.  Mary wanted you to have the samples ASAP.

10   No one else has samples yet?.  Do you see that

11   response?

12        A.   I do.

13        Q.   Do you recall if you ever responded to

14   that email?

15        A.   I don't recall if I responded to that

16   particular email.  I would have -- It should have

17   pulled up in my search if I did, so I -- likely not.

18        Q.   Do you recall ever having further

19   discussions about the CNC process to make a

20   simulated tile sheet after this email?

21        A.   I don't recall.

22        Q.   Is this email that you attach to your

23   Declaration the full extent of the documented

24   discussions that you've had with Mark about the use

25   of a rounded bit and a shallower cut?

1          MR. HALVERSON:  Objection.  Form.

2          A.   I know it's the primary email

3     documentation.  I don't recall if there was anything

4     after this at all.

5          Q.   And you don't have any other documents,

6     notes, lab notebooks, anything else in written form

7     that shows this idea of using a rounder bit to make

8     a shallower cut, do you?

9          A.   In document form, not at this time.

10          MR. REMUS:  Why don't we, if it's okay with you

11          guys, take a short break?  I just want to check

12          my notes.  I should be able to wrap up, but why

13          don't we just take a short break and then we

14          can see where we stand.  Sound good?

15          MR. HALVERSON:  Sounds good.

16          MR. REMUS:  All right, we can go off the

17          record.

18          MR. JEWELL:  Going off video record, the time

19          is now 17:11 UTC.

20                    (OFF THE RECORD)

21          MR. JEWELL:  Back on the video record, the time

22          is now 17:14 UTC.

23     BY MR. REMUS:

24          Q.   Mr. Whitley, are you under any obligation

25     to assign your inventions to Milestone or any other

1      company?

2             A.    Yes.

3             Q.    What are those obligations?

4             A.    The new owners.  I've got a rep and

5      warranty in our -- in our share purchase agreement.

6             Q.    What is that rep and warranty?

7             A.    The -- The rep and warranty covers this

8      issue, if it ever got to this point, because of the

9      initial -- the initial cease and desist went away

10     for multiple years.  So I disclosed that to the new

11     owners, that that was a legal threat on the books,

12     as I should.  So I gave them a rep and warranty.  As

13     part of that Milestone has a right to sell this

14     product, and if I'm successful in getting named as a

15     patent holder it will be assigned to Milestone in

16     some -- in some form, not -- not -- At that point in

17     time we didn't think I would be the named patent

18     holder but the form of that is yet to be determined.

19     But I have an obligation to let Milestone sell this

20     product.

21            Q.    Why didn't you think you would be a named

22     inventor at that time?

23            A.    There was no --

24            MR. HALVERSON:  I'm just going to object to --

25            Just a second.

1           To the extent you can answer that question

2      without revealing any communications or advice

3      you had with a lawyer, you're welcome to.

4      THE DEPONENT:  Okay, can you --

5      MR. HALVERSON:  Would it --

6      THE DEPONENT:  Okay.

7      MR. HALVERSON:  Just be mindful of not

8      inadvertently waiving privileged

9      communications that --

10      THE DEPONENT:  Okay, can you repeat the

11      question, or the last part there?

12      MR. REMUS:  Do -- Do you have the question,

13      Laurie?

14      MADAM REPORTER:  I can play it back.

15      MR. REMUS:  Oh no, that's fine.

16  BY MR. REMUS:

17      Q.   Do you believe that you should be a named

18  inventor of the 243 patent?

19      A.   Yes.

20      Q.   When did you form that opinion?

21      A.   At the first receipt of the cease and

22  desist, which I believe was somewhere around 2020.

23      Q.   And why do you believe you should be a

24  named inventor?

25      MR. HALVERSON:  Just same caution from before.

1    A.   Because I was highly involved in the

2    development of this product.

3         Q.   Do you believe that you conceived of any

4    aspect of the invention that's described in the 243

5    patent?

6         A.   I do.

7         Q.   Okay, what aspect is that?

8         A.   The --

9    MR. HALVERSON:  Objection.  Form.  Calls for a

10        legal conclusion.

11        A.   The fit and finish of the grooving and how

12   the bit was used in order to get that to a final

13   product.

14        Q.   Do you believe that it was inventive to

15   have rounded simulated grout lines?

16   MR. HALVERSON:  Same objection.

17        A.   Yes.

18        Q.   Why?

19        A.   I don't believe Mark would have got there

20   in -- in -- certainly not in the same time period.

21   I was involved in some of the other part of the

22   process as well, but this part he -- he did not get

23   there without my help.

24        Q.   And was your contribution something that

25   you think was inventive and not well-known?

1          MR. HALVERSON:  Objection.  Form.  Asked and

2      answered.

3          A.    Sorry, can you repeat the question?

4          Q.    Sure.  Do you think your contribution was

5      something that was inventive and not well-known?

6          MR. HALVERSON:  Same objection.

7          A.    I thought the whole project was relatively

8      simple.  However, being that it turned out

9      differently in the end, that portion has -- has

10     certainly changed my mind that it is inventive.

11         Q.    What changed your mind?

12         A.    Well, the -- the patent document and

13     reading through it.  It's something I thought was

14     relatively simple, no discussions regarding

15     patenting this.  So I don't believe at the time

16     Mark found that it was earthshattering to our

17     industry or highly technical enough for a patent.  I

18     think we both felt that way.  But obviously it's a

19     little different circumstance now when you look at

20     the -- an accepted patent.  And because it was

21     accepted I -- I have a very strong belief that I

22     should have been a co-inventor on that because I was

23     involved at that level.

24         Q.    In -- In your opinion was the use of

25     rounded grout lines inventive in 20?15?

U.S. Legal Support  |  www.uslegalsupport.com

1          A.   Well, the --

2          MR. HALVERSON:  Objection.  Form.  Calls for a

3     legal conclusion.

4          A.   It was a 20?13/20?14 discussion, not

5     20?15.

6          Q.   Okay, so as of that time period do you

7     think it was inventive to simulate grout lines that

8     were rounded?

9          MR. HALVERSON:  Objection.  Form.

10         A.   So in that time period when I was there

11    did I think it was inventive?

12         Q.   Yes.

13         A.   No.

14         Q.   Did you ever apply for a patent on the

15    subject matter that is described in the 243 patent?

16         A.   No.

17         Q.   Why not?

18         A.   Did not feel it was patentable.

19         MR. REMUS:  At this time BCI does not have any

20    further questions for Mr. Whitley based on the

21    limited scope of discovery allowed by the

22    Court.

23    BY MR. HALVERSON:

24         Q.   Very briefly, Mr. Whitley.  Do you recall

25    being asked a couple of questions earlier this

1    morning by Mr. Remus about the dates of our own

2    products, and you asked for an email to help refresh

3    your recollection about those dates.  Do you recall

4    that?

5         A.   Yes, early in our conversations.  Sorry,

6    my phone's going off here.

7         Q.   Did you receive that email as an exhibit

8    in the process of the rest of the deposition today?

9         A.   I don't -- I don't remember the initial

10   question to be honest.

11        Q.   So I guess putting it in different terms,

12   given that you weren't given the information as you

13   wanted at the point in time to answer that question,

14   did any of the emails that you looked at as the

15   deposition progressed help refresh your recollection

16   about when it was that Milestone first began its own

17   independent investigation into using a CNC machine

18   to grout -- rout out grout lines?

19        A.   Yes.

20        Q.   And what is that timeframe?

21        A.   That is 2014.

22        Q.   Do you also recall being asked a number of

23   questions about your conversations with Mr.

24   Domanico?

25        A.   Yes.

1        Q.   You used the term ?recant?, that happened

2    both in some questions and some answers when you

3    were talking about writing down or memorializing

4    those conversations.  When you used the term

5    ?recant? there, did you mean remember or recall?

6        A.   Recall, yes.

7        Q.   And then did Mark ever say anything to you

8    -- Excuse me, let me start over.  Did Mr. Domanico

9    ever say anything to you about why he didn't intend

10   to patent the CNC idea?

11       A.   He did.  He told me he never thought it

12   was a -- a patentable idea until his -- until his

13   legal counsel suggested it to him.

14       MR. HALVERSON:  I have no further questions.

15       MR. REMUS:  Nothing further from BCI.

16       MR. HALVERSON:  We can go off.  Oh, the witness

17       will read and sign.

18       MR. JEWELL:  Going off -- Going off the record.

19       The time is now 17:23 UTC.

20                    (EXAMINATION CONCLUDED)

CERTIFICATION

1   THIS IS TO CERTIFY THAT the foregoing

2   is a true and accurate transcription from the

3   record, made by sound recording apparatus,

4   to the best of my skill and ability.

5

6   _____

7   Barbara Summers

8   Quality Control for LAURIE BARKER

9

10

11  Photostat copies of this transcript

12  are not certified and have not been paid for unless

13  they bear the original signature of Barbara Summers

14

15

16      Transcript Ordered:  December 6, 2023

17      Transcript Completed:  December 15, 2023

18

U.S. Legal Support | www.uslegalsupport.com

```
 1   Errata Sheet

 2

 3   NAME OF CASE: BCI Acrylic vs Milestone Bath Products - 12-06-23 - Jeffrey Whitley

 4   DATE OF DEPOSITION: 12/06/2023

 5   NAME OF WITNESS: Jeffrey Whitley

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                          _____
```