# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BCI ACRYLIC, INC., <br><br> Plaintiff, <br><br> v. <br><br> MILESTONE BATH PRODUCTS, INC. d/b/a BELLASTONE BATH SYSTEMS and TIGHTSEAL LLC, <br><br> Defendants. | Case No. 23-CV-908-JPS <br><br><br> **ORDER** |

      Plaintiff BCI Acrylic, Inc. ("Plaintiff") sues Defendants Milestone Bath Products, Inc. d/b/a Bellastone Bath Systems ("Milestone") and Tightseal LLC (with Milestone, "Defendants") for patent infringement. ECF No. 1. On October 2, 2023, the Court ordered the parties to conduct "limited discovery on the issue of standing"; specifically, on Defendants' contention that "Jeff Whitley [("Whitley")] is an unnamed co-inventor of the patent at issue . . . and [Plaintiff's] failure to include him as a plaintiff means . . . Plaintiff does not have standing to bring this case" because Plaintiff lacks "the consent of all patentees." ECF No. 22; ECF No. 21 at 2. The Court reserved the issue of whether an inventorship challenge is properly a standing challenge under the facts of this case—i.e., where there is no dispute as to Plaintiff's ownership of the patent at issue—for consideration alongside any motion to dismiss that would be filed. ECF No. 22. Now before the Court is Defendants' fully briefed motion to dismiss for lack of standing. ECF Nos. 26, 27, 32, 33. For the reasons set forth below, the Court will deny the motion.

1. **RELEVANT FACTS**

    1.1 **Undisputed Facts**[1]

On February 18, 2015, the provisional application to which U.S. Patent No. 10,144,243 ("the '243 patent") claims priority was filed as U.S. Provisional Patent Application No. 62/117,548. On February 17, 2016, Mark Domanico ("Domanico") assigned his rights to the '243 patent to Luxury Bath Liners, Inc. The application leading to the '243 patent was filed as U.S. Patent Application No. 15/046,864 ("the '864 application") on February 18, 2016. The '864 application claims priority to the provisional application filed as U.S. Patent Application No. 62/117,548.

On January 25, 2018, Luxury Bath Liners, Inc. assigned its rights in the '243 patent to Plaintiff. The '243 patent issued on December 4, 2018. Domanico is listed as the sole inventor on the face of the '243 patent.

    1.2 **Defendants' Disputed Facts**[2]

Whitley has worked in the bath remodeling industry for approximately twenty-eight years. Whitley first met Domanico in the mid-2000s when Whitley became the exclusive Canadian distributor of certain products for Luxury Bath Technologies Inc. During this time, Whitley began developing his process for creating acrylic shower walls by removing

---

[1] The Court adopts the parties' joint statement of undisputed facts with minor, non-substantive edits. ECF No. 28. Internal citations are omitted for brevity.

[2] Defendants submitted a statement of disputed facts in accordance with the Court's pretrial order, although the facts are not itemized as the Court had ordered. ECF No. 27-9; ECF No. 7 at 4. Because both parties took certain liberties with the Court's requirements, *see infra* note 3, the Court will consider Defendants' proffered facts as submitted. This section largely reproduces those facts with internal citations omitted for brevity. Where relevant facts derive from Defendants' brief or from other documents in the record, the Court so notes with a citation.

grout line patterns from acrylic boards. He also regularly collaborated with Domanico on technical advances in the bathtub tile space; for example, around 2014, they collaborated to develop a method of printing simulated marble patterns onto acrylic sheets. They regularly shared testing samples and exchanged advice regarding improvements.

In 2014, Domanico worked for Luxury Bath Technologies Inc. Domanico and Whitley were working on a method of carving a tile pattern into a sheet of acrylic plastic to simulate a tile shower wall having a grout look. Whitley avers that "[n]o discussion of a patent application was entertained as the process was simple and the equipment and process w[ere] very commonly available." ECF No. 27-2 at 3. According to Whitley, he and Domanico together "developed a method of carving a tile pattern into a sheet of acrylic plastic, which would then have simulated grout lines via the carved seams." *Id.* at 3–4. At a meeting to discuss the product and Domanico's "idea of carving out certain tile patterns from a multi-layer acrylic sheet," Whitley verbally communicated concerns and suggestions to Domanico. *Id.* at 4. Subsequent to the meeting, in late 2014 and during the testing of the product, Domanico gave Whitley product samples to which Whitley "reiterated" his suggestions by email: (1) to use a rounded bit, not the square bit that Domanico was using, and (2) to remove less material than Domanico's sample removed. Whitley's contributions were thus conveyed at an in-person meeting as well as subsequently via email (the "2014 Email"), which is reproduced below. ECF No. 27 at 6 (citing ECF No. 27-2 at 11).

> From: Mark Domanico <md@luxbathinc.com>
> Date: November 5, 2014 at 5:44:13 PM EST
> To: Jeff Whitley <jeff.whitley@milestonebath.com>, Mary Riordan <MaryR@luxbathinc.com>
> Cc: Tiffany Koll <tiffany.koll@milestonebath.com>, Laura Dolamore <laura.dolamore@milestonebath.com>
> Subject: RE: new tile walls
>
> Jeff,
> We have already ordered a rounded bit for our CNC Router.
> Mary wanted you to have the samples ASAP.
> No one else has samples yet.
>
> Mark Domanico
>
> ---
>
> From: Jeff Whitley [mailto:jeff.whitley@milestonebath.com]
> Sent: Tuesday, November 4, 2014 10:44 AM
> To: Mary Riordan; Mark Domanico
> Cc: Tiffany Koll; Laura Dolamore
> Subject: new tile walls
>
> Hi Mary and Mark,
>
> I received the new wall samples and they look really nice.
>
> I wanted to share a concern that several people here voiced on this product, perhaps you have even heard this before. Although we really love the concept, everybody here was concerned with the sharp edges at the grout lines. We think this will prevent some people from purchasing the walls, and in an extreme case could be possible to actually cut someone.
>
> As a suggestion, the exact same process but using a different shaped bit may create a smoother cut that solves the above issues. Less of an impression would also make it more realistic.

To support Whitley's version of events, Defendants point to Domanico's testimony that he and Whitley did meet in person and discussed the product prior to the 2014 Email, but that Domanico did not remember talking to Whitley about his ideas at that time. ECF No. 27 at 7 (citing ECF No. 27-3 at 143–44) (Domanico's testimony that he "saw [Whitley] right before [the 2014 Email], and we talked about the product, and I don't remember talking—truth? I don't remember talking to him about this. I'm sure looking at this letter, he did, but I was so busy at the time, this came later."). Defendants also assert that Domanico's response to the 2014 Email that "Mary wanted [Whitley] to have the samples ASAP" indicates that "prototyping and design efforts were ongoing." ECF No. 27 at 8 (quoting ECF No. 27-2 at 11).

Whitley contends that "[t]his type of collaboration was indicative of the normal working relationship" between him and Domanico, ECF No. 27-2 at 4, and that Whitley routinely provided improvements to ideas that he

and Domanico would co-develop. By way of additional example, the same day that Whitley sent the 2014 Email, Domanico's lawyer requested to meet with Whitley to "get [his] feedback" on "a few concepts" regarding "the new tile walls." ECF No. 27 at 8 (quoting ECF No. 27-6 at 2).

Domanico never informed Whitley that he was filing for a patent on their allegedly collective ideas. Upon receipt of Plaintiff's demand in 2020, Whitley informed Plaintiff that: (1) Milestone did not infringe, and (2) that Whitley was a co-inventor of the '243 patent based on his suggestions to Domanico during the development phase in 2014. Defendants contend that Whitley's contributions can be found in claims 5 and 7 of the '243 patent:

> 5. The method of claim 4 wherein the grout lines are defined by rounded edges.

> 7. The method of claim 1 wherein the predetermined amount of material removed from the top displayed surface is substantially 0.005 inches.

ECF No. 27 at 11–12 (citing ECF No. 27-1).

Despite not being present in the provisional application, Defendants argue that Whitley's contributions formed the basis for distinguishing the claims of the '243 patent from the prior art. Specifically, Defendants assert that the fact that the provisional application lacked any description of the subject matter of claims 5 or 7 and that this subject matter was only added later to "form[] the basis for . . . Domanico's response to the patent office when arguing the differences between the prior art and the claims that ultimately issued" shows that the contributions are significant and not part of the prior art. ECF No. 27 at 12–13.

### 1.3    Plaintiff's Disputed Facts[3]

Domanico is a self-proclaimed tinkerer who owned and ran a bath renovation business, Luxury Bath Liners, Inc. For some bathroom projects, companies use acrylic sheets that simulate the appearance of real tile to reduce the time and expense of the project. One of the challenges with making simulated tile acrylic sheets is making the simulated grout lines look realistic. Prior to Domanico's invention, the simulated grout lines were formed using a thermoforming process. The acrylic sheets were attached to a mold, heated, and then sucked down into the mold where the mold formed the simulated grout lines in the acrylic sheets. This process was time

---

[3] Like Defendants, Plaintiff also submitted a statement of ostensibly disputed facts. However, Plaintiff's proffered facts are embedded in its brief, ECF No. 32 at 5–7, which violates the Court's order to submit disputed facts in a separately filed document and to omit a facts section from the brief. ECF No. 7 at 4. Nonetheless, the Court considers Plaintiff's proffered facts, just as it considered Defendants' non-itemized facts. *See supra* note 2. Internal citations are omitted for brevity. However, where relevant facts derive from elsewhere in Plaintiff's brief or from other documents in the record, the Court so notes with a citation.

Additionally, *both* parties cite to deposition testimony and other exhibits (which are not cited in their disputed fact statements) throughout their briefs, which also contravenes the Court's order. *See Kreuziger v. Milwaukee Cnty.*, 617 F. Supp. 3d 970, 974 (E.D. Wis. 2022), *aff'd*, 60 F.4th 391 (7th Cir. 2023) ("[T]he four-and-one-half page statement of facts in [plaintiff's] moving brief cites almost exclusively to various affidavits . . .; such facts go far beyond those stipulated between the parties and even beyond those enumerated in [plaintiff's] separate set of disputed facts. This is a clear flout of the Court's order.").

The Court has reviewed the testimony and exhibits and noted the same where relevant in this Order, but as this case proceeds towards summary judgment motions, the parties are reminded to comply with the Court's orders to the letter. Failure to conform summary judgment submissions to the Court's orders will result in rejection of the submissions and denial of the motions without prejudice.

consuming and expensive because of the time to heat the sheet, mold it, and then let it cool. Also, a different mold was need for every tile pattern.

Inspired by a nameplate on a desk, Domanico came up with the idea of making simulated tile panels in which simulated grout lines were cut into acrylic sheets using a router and a computer numerical control ("CNC") machine. Domanico created prototype samples using a CNC machine and a router bit that he had on hand. The particular router bit he had on hand was a straight bit (instead of rounded bit) because he used the straight bit to cut the thermoformed acrylic sheets to size. The problem with the straight bit was that the "grout lines" it made were so sharp that they could cut someone's hand. Moreover, real grout lines are not sharp—they are round—so sharp grout lines did not look real. Domanico was well aware of this problem and had ordered a rounded bit to use in the future. He was very excited about his new idea and did not want to delay getting it in the hands of prospective customers.

Domanico sent some of these prototype sheets to Whitley. Whitley owned and ran Milestone, which was a Canadian customer and distributor of products made by Luxury Bath Liners, Inc. Upon receipt of the samples, Whitley sent the 2014 Email to Domanico, stating that the samples "look really nice" and that "we really love the concept." Whitley suggested using a rounded bit to create a "smoother cut" with "[l]ess of an impression," but Domanico was already aware of the issues with sharp grout lines and the solution of using a rounded router bit, which he explained in his responsive email the next day. *See supra* 2014 Email Screenshot ("We have already ordered a rounded bit . . . .").

At his deposition, Domanico testified that he had already ordered a rounded bit prior to receiving the 2014 Email because the "straight cutting

Page 7 of 17
Case 2:23-cv-00908-JPS    Filed 02/08/24    Page 7 of 17    Document 34

bit" he had been using "left very sharp edges . . . [and he] actually cut [him]self leaning into it." ECF No. 27-3 at 141–42. He testified that the rounded bit instead created an impression that was "curved in kind of a *very shallow* U-shape." *Id.* at 114 (emphasis added). He further testified that Whitley's 2014 Email did not tell him anything he didn't know, and that he sent the samples to Whitley in order to drum up business. *Id.* at 143–44 (Domanico testifying that he brought samples to Whitley because he "[would have] love[d] to sell it to [him]"), 152 (Domanico testifying that "[t]he only thing I ever got from [Whitley] was [the 2014 Email], and it was after . . . I had already had that . . . incorporated and ordered"). Domanico was adamant throughout his deposition that he is the true and correct sole inventor. *Id.* at 171 ("I invented it. I never even thought of . . . Whitley or anybody else I talked to. I'm the one put in the hours, I'm the one that did all the prototypes, I'm the one that invented it."), 166 ("I was alone in that room working on stuff and making drawings and—and many, many other projects, period . . . .").

Plaintiff also asserts that the 2014 Email did not contribute to any difference between the provisional and non-provisional applications because the 2014 Email existed before either of those applications was filed. ECF No. 32 at 12. Finally, Plaintiff cites Whitley's testimony to establish that the email from Domanico's lawyer to discuss "concepts," ECF No. 27-6 at 2, referred to business concepts, not technical concepts. ECF No. 32 at 12 (citing ECF No. 32-1 at 95–96).

2. **LEGAL STANDARD & ANALYSIS**

Standing is considered an "essential ingredient of subject-matter jurisdiction." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "The standing

Page 8 of 17
Case 2:23-cv-00908-JPS   Filed 02/08/24   Page 8 of 17   Document 34

doctrine has two components: Article III standing, which implicates the jurisdiction of the federal courts, and prudential standing, 'which embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *OptoLum, Inc. v. Cree, Inc.*, 490 F. Supp. 3d 916, 923 (M.D.N.C. 2020) (quoting *United States v. Windsor*, 570 U.S. 744, 757 (2013) (internal quotation marks omitted)).

In patent infringement actions where, like here, the defendant claims that a non-party was "improperly omitted as a joint inventor (nonjoinder)," the prudential standing component of the standing doctrine is implicated. *Allergan v. Teva Pharms. USA, Inc.*, No. 2:15-cv-1455-WCB, 2017 WL 11572810, at *7 (E.D. Tex. Aug. 3, 2017) (citing *Israel Bio-Eng'g Project v. Amgen, Inc.*, 401 F.3d 1299, 1304–05 (Fed. Cir. 2005) and *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467–68 (Fed. Cir. 1998)). Omission of a joint inventor "requires that the action be dismissed for failure to comply with [35 U.S.C. §] 281, as construed[.]" *Id.* (citing *Israel Bio-Eng'g*, 401 F.3d at 1304–05 ("Even an ownership interest [obtained from one inventor], however, would not be sufficient to give [the plaintiff] prudential standing to sue for infringement, as [the plaintiff] would have to join all other co-owners [co-inventors] in order to establish such standing.") and *Ethicon*, 135 F.3d at 1467–68).

The party invoking the Court's jurisdiction, here Plaintiff, bears the burden to establish standing. *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103–04 (1988) ("[T]he party invoking federal question jurisdiction bears the burden of establishing its existence.") (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)). However, there is also a "general rule . . . that a party alleging . . . non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence." *Allergan*, 2017 WL

11572810, at *2 (quoting *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004) and collecting cases).

Therefore, as the court in *Allergan* explained, a motion to dismiss for lack of standing based on a nonjoinder issue presents a dilemma as to the appropriate burden of proof. *Id.* at *7. Specifically,

> [i]f the misjoinder and nonjoinder issues are viewed as going to the validity of the . . . patents, then the burden of proof rests with the defendants and, absent the defendants' entitlement to summary judgment, the matter must be resolved based on the evidence at trial. On the other hand, if the misjoinder and nonjoinder issues are viewed as going to standing, the matter would be appropriate for resolution prior to trial, and [the plaintiff] would bear the burden of proof. The difficulty is that in a case such as this one, questions of jurisdiction and the allocation of the burden of proof appear to turn on the parties' characterization of the issue, whether as an issue of standing or as an issue of invalidity for incorrect inventorship.

*Id.*

Like in *Allergan*, Plaintiff argues that Defendants' motion is premature at the pleadings stage, ECF No. 32 at 8, and alternatively that Defendants have failed to meet their burden of proving non-joinder of Whitley by clear and convincing evidence, *id.* at 10. Conversely, Defendants contend that their motion "seeks dismissal of the Complaint for lack of standing. It does not seek to correct the inventorship." ECF No. 33 at 6. Defendants argue that Plaintiff bears the burden of proof to establish standing, ECF No. 27 at 6, but simultaneously concede that it is their own burden to overcome the "presumption that the listing of inventors on the face of a patent application is accurate . . . by clear and convincing evidence," *id.* at 5 (citing *Blue Gentian, LLC v. Tristar Prods., Inc.*, 70 F.4th 1351, 1357 (Fed. Cir. 2023)).

The Federal Circuit recently confronted this dilemma in *Drone Technologies, Inc. v. Parrot S.A.*, 838 F.3d 1283 (Fed. Cir. 2016). There, like here, there was no dispute that only one inventor was named on the face of the patent at issue. *Drone Techs.*, 838 F.3d at 1292. There was also no dispute that the sole named inventor validly assigned her ownership interest in the patent to the plaintiff. *Id.* The court held, as to the defendant's standing challenge based on non-joinder of an alleged co-inventor, that the presumption of correct inventorship applied because other avenues exist to challenge inventorship. *Id.* ("[Defendant] has failed to advance a persuasive reason for not accepting this presumption at this stage of the litigation, *particularly when another avenue exists for it to challenge inventorship*.") (emphasis added). In other words, a defendant should not be able to use a motion to dismiss for lack of standing to switch a burden of proof that would otherwise fall on it under other avenues.

With respect to other "avenue[s] . . . to challenge inventorship," "[h]istorically, a party could assert a patent's invalidity under § 102(f) due to the failure to identify a co-inventor in the patent." *Bd. of Tr. of Univ. of Ill. v. Micron Tech., Inc.*, 245 F. Supp. 3d 1036, 1041 n.1 (C.D. Ill. 2017) (citing 35 U.S.C § 102(f) (2006)). Although § 102(f) "has been eliminated from the statutory scheme, . . . the defense is presumably still available under § 101, which allows patents to only be provided to '[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . .'" *Id.* (quoting 35 U.S.C. § 101). This defense may be available where the movant seeks to invalidate the patent instead of or in addition to correcting inventorship. *See id.* As the *Drone Technologies* court observes, 35 U.S.C. § 256 is available as a mechanism to move the court to correct inventorship. 838 F.3d at 1293–94 (citing *Ethicon*, 135 F.3d at 1459–60).

The *Drone Technologies* court then took its holding one step further, explaining that the defendant also failed to "cite any controlling authority suggesting that [the court] must undertake," in the first instance, "a substantive examination of *inventorship* in order to resolve an issue of *standing* in an infringement action *where the plaintiff's claim to title is not otherwise in dispute.*" *Id.* at 1293 (emphasis added). The court thus conducted a straightforward prudential standing analysis. *Id.* at 1294. Because it was undisputed that the named inventor was the sole inventor on the face of the patent and that the assignment was valid, the plaintiff had established prudential standing under § 281. *Id.*

The Court is persuaded in light of this authority alone that Defendants' standing challenge is untenable because Plaintiff's claim to title is not in dispute. Under these circumstances, *Drone Technologies* conclusively establishes, in this Court's and in at least one other district court's view, that inventorship is either a defense or meant to be raised under § 256—not through a standing challenge. *See Micron Tech., Inc.*, 245 F. Supp. 3d at 1042 ("The Federal Circuit held that the district court was not obligated to consider inventorship when it assessed whether the plaintiff had standing to sue because the 'district court never granted (or even considered) a § 256 motion . . . .'") (quoting *Drone Techs.*, 838 F.3d at 1294).[4] However, the Court observes, as do the parties, that some district courts in the wake of *Drone Technologies* may read its holding differently.

---

[4] The *Micron Technology* court recognized, as the Court does in this Order, the *Drone Technologies* court's explanation that the proper way to present an inventorship challenge where the movant seeks only "to add a co-inventor rather than invalidate the patents" is through a § 256 motion. 245 F. Supp. 3d at 1041–42 & n.1 (citing *Drone Techs.*, 838 F.3d at 1294).

Specifically, the *Allergan* court concluded that all *Drone Technologies* established is that "the proper procedure in such cases is to address the inventorship dispute in the first instance as a matter of invalidity, not standing." *Allergan*, 2017 WL 11572810, at *7 (citing *Drone Techs.*, 838 F.3d at 1292). In other words, "[w]hen faced with a standing challenge premised on an inventorship dispute," courts (1) apply the presumption that "the named inventor is correctly named as the sole inventor," but (2) allow the defendant to seek dismissal for lack of standing by "overcom[ing] that presumption . . . by showing incorrect inventorship by clear and convincing evidence." *Id.* (first quoting *Drone Techs.*, 838 F.3d at 1292 (internal bracketing omitted) and then citing *Cumberland Pharms. Inc. v. Mylan Inst. LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017); *Aradigm Corp.*, 376 F.3d at 1358; and *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)); *see also OptoLum*, 490 F. Supp. 3d at 923–26 (conducting substantive analysis of inventorship in response to prudential standing challenge).

In *Allergan*, for example, the court reviewed the evidence before it and concluded that the defendants had not overcome the presumption of correct inventorship by clear and convincing evidence on a motion to dismiss for lack of standing. 2017 WL 11572810, at *11–12. Defendants urge the Court to follow the "case-specific inquiry" relied upon in *Allergan*, but, of course, they seek a finding that they have overcome the presumption of correct inventorship. ECF No. 33 at 7 (citing *Allergan*, 2017 WL 11572810, at *11–12). In turn, Plaintiff cites *Allergan* to support its alternate argument that even if the Court can hear Defendants' inventorship challenge as a standing challenge, the "conflicting deposition testimony" from Domanico and Whitley shows that Defendants have not overcome the presumption of

correct inventorship. ECF No. 32 at 19 (citing *Allergan*, 2017 WL 11572810, at *3–5).

As explained, the Court believes that *Drone Technologies* does not authorize a searching inquiry into inventorship in the form of a standing challenge when the plaintiff's claim to title is not otherwise in dispute. At first blush, the *Allergan* court appears to read that holding differently, as the parties suggest. However, in *Allergan* (unlike *Drone Technologies* and the facts of this case), the defendants challenged not only the non-joinder of an allegedly correct inventor, but also argued that "[the plaintiff] lack[ed] any ownership interest" in the patents at issue. 2017 WL 11572810, at *6. Thus, *Allergan* had the alternate fact pattern that the *Drone Technologies* court suggested may warrant an inquiry into inventorship as a standing challenge: a dispute as to the plaintiff's claim to title. *Drone Techs.*, 838 F.3d at 1293. Moreover, the prudential standing analysis that the *Allergan* court conducted dealt with whether the alleged co-inventor assigned its interest in the patents at issue to the plaintiff; it did not deal with a substantive analysis of the elements of co-inventorship. 2017 WL 11572810, at *8–11.[5]

The same is true in *OptoLum*, where the court conducted a prudential standing analysis of inventorship in response to a standing challenge where the issue was ultimately whether the spouse of the inventor had an ownership interest under state community property laws. 490 F. Supp. 3d at 923. For these reasons, the Court finds that *Allergan* and *OptoLum* are distinguishable from the facts here, and that the appropriate resolution is

---

[5]The court also conducted an Article III standing analysis as to whether the plaintiff "ha[d] any ownership rights," which, again, is not an issue before the Court here. *Allergan*, 2017 WL 11572810, at *11 (citing *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1368 (Fed. Cir. 2003)).

to deny Defendants' motion on the grounds that Plaintiff has met its burden under the straightforward § 281 prudential standing analysis described in *Drone Technologies*.

However, even if the Court were to conduct a case-specific inquiry, Defendants have not overcome the presumption of correct inventorship by clear and convincing evidence. The Court so notes to indicate that, based on the record currently before it and absent the introduction of additional evidence, any further inventorship challenge, such as a motion under § 256, is unlikely to be granted. To support a § 256 motion, an alleged joint inventor must show (1) "that he contributed significantly to the conception—the definite and permanent idea of the invention—or reduction to practice of at least one claim" and (2) "that these contributions arose from 'some element of joint behavior, such as collaboration or working under common direction' with the other inventor(s)." *Blue Gentian*, 70 F.4th at 1358 (citing *Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1371 (Fed. Cir. 2020) and quoting *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co., Inc.*, 973 F.2d 911, 917 (Fed. Cir. 1992)).

As to Defendants' burden of proof, "[a]n alleged joint inventor's testimony standing alone is insufficient to establish inventorship by clear and convincing evidence." *Id.* at 1357 (citing *Ethicon*, 135 F.3d at 1461). "Thus, an alleged co-inventor must supply evidence to corroborate his testimony." *Id.* (quoting *Ethicon*, 135 F.3d at 1461). "'Corroborating evidence may take many forms,' including 'contemporaneous documents' or physical evidence, '[c]ircumstantial evidence,' and 'oral testimony of someone other than the alleged inventor.'" *Id.* (quoting *Ethicon, Inc.*, 135 F.3d at 1461 and citing *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed. Cir. 2001)). "To determine whether testimony has

been sufficiently corroborated, a 'rule of reason' test is applied where 'all pertinent evidence is examined in order to determine whether the inventor's story is credible[,]'" which is a conclusion that may be reached by the court. *Id.* (quoting *Sandt Tech.*, 264 F.3d at 1350 and citing *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014)).

Defendants argue that the 2014 Email and the sequence of the '243 patent prosecution sufficiently corroborate Whitley's testimony that Whitley contributed to the conception of the invention in collaboration with Domanico. ECF No. 27 at 6, 11. The Court disagrees.

The 2014 Email does not corroborate Whitley's alleged contributions given Domanico's response that he had already ordered a rounded bit, combined with the fact that the 2014 Email can be read to support Domanico's testimony that use of a rounded bit creates a shallower impression. Nor does the 2014 Email alone corroborate whether there was *any* in-person meeting prior to Domanico sending Whitley the samples. While Domanico testified that he did see Whitley in person prior to receiving the 2014 Email, he testified that the two discussed the *product* at that meeting but he did not recall discussing his *ideas*. He testified that he brought Whitley the samples to try to sell them to him. Even if Domanico's testimony were construed to mean that he did recall discussing ideas, his testimony does not corroborate or indicate from whom the ideas were raised—or when in the timeline. In other words, there is insufficient evidence to corroborate that Whitley conceived of the ideas to use a rounded bit and to remove less material and communicated those ideas to Domanico *before* Domanico cut himself and ordered the rounded bit. As to the patent prosecution, the 2014 Email was sent prior to the filing of the

Page 16 of 17
Case 2:23-cv-00908-JPS     Filed 02/08/24     Page 16 of 17     Document 34

provisional application, and so the fact that Whitley's alleged contributions were added later does not sufficiently tie those additions to the 2014 Email.

Simply put, although Defendants rely heavily on *Blue Gentian*, the facts here are a far cry from the facts there. In that case, the co-inventors' single meeting was corroborated by three other witnesses, the alleged co-inventor had many prior patents in the subject area and the named co-inventor did not, and the alleged co-inventor showed a prototype that the named co-inventor ostensibly used to build his own prototype. *See Blue Gentian*, 70 F.4th at 1355–56. The record currently before the Court does not support a successful inventorship challenge given Defendants' burden of proof.

### 3. CONCLUSION

Based on the foregoing analysis, the Court denies Defendants' motion to dismiss for lack of standing.

Accordingly,

**IT IS ORDERED** that Defendants Milestone Bath Products, Inc. d/b/a Bellastone Bath Systems and Tightseal LLC's motion to dismiss for lack of standing, ECF No. 26, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2024.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

Page 17 of 17
Case 2:23-cv-00908-JPS   Filed 02/08/24   Page 17 of 17   Document 34